**BOARD OF COUNTY SUPERVISORS OF PRINCE WILLIAM COUNTY, VIRGINIA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–364 L.

United States Court of Federal Claims.

Sept. 28, 2000.

appears to be the rule in the majority of states, it is not controlling here.

County Attorney Sharon E. Pandack, Prince William, Virginia, for plaintiff, with whom were Senior Assistant County Attorney Ross G. Horton, and Assistant County Attorney Gifford R. Hampshire.

Alan Brenner, United States Department of Justice, Environment and Natural Resource Division, Washington, D.C., for respondent, with whom was Donald Rosendorf, United States Department of Justice.

## OPINION

MOODY R. TIDWELL, III, Senior Judge.

This case is before the court on remand from the Court of Appeals for the Federal Circuit, to ascertain just compensation owed to plaintiff under the Fifth Amendment to the United States Constitution for the legislative taking of real property. A hearing was held from February 9–10, 2000, to supplement the extensive record in these proceedings. Upon considering the record as a whole, accumulated since the genesis of this case some ten years ago through the February 2000 trial, the court holds that the fair market value of the subject property is *$1.65* per square foot.

## BACKGROUND

### I. Factual History of the Legislative Taking

This case resulted from the legislative taking, on November 10, 1988, of 550 acres of property zoned for planned mixed development known as the William Center, in Prince William County, Virginia. The agricultural tract of land was originally purchased in 1986 by a number of legal entities (hereinafter referred to as the "developer") with the intent to develop the property, for both residential and nonresidential uses. Part of the rezoning conditions required the developer to convey approximately 16.05 acres of the parcel (hereinafter referred to as the "subject property") to the County of Prince William, Virginia, for use as public roads. As of the time of the taking, the subject property was zoned as a Planned Mixed–Use District (hereinafter referred to as "PMD"). In addition to the conveyance, the developer agreed to undertake certain activities, as approved by the County's Office of Planning, known as the "Proffer/Development Plan." Some of the proffers included contributing funding to the County for public school purposes, providing land for a fire station, creating certain recreational facilities, and creating a property owners' association.

Soon thereafter, a conflict erupted over the development of the property between the developer and a citizen coalition group protesting the development of the land, which was adjacent to the Manassas Battlefield Park, a historic Civil War site in Virginia. Congress put an end to this dispute after enacting the Manassas National Battlefield Park Amendments of 1988 (hereinafter referred to as the "Act"), Title X of the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, 102 Stat. 3342, 3810 (1988), codified at 16 U.S.C. § 429b(b) (1988). The Act vested in the United States all right, title, and interest to the real property owned by the developer and the County. Additionally, the Act obligated the federal government, pursuant to the Full Faith and Credit of the United States, to pay just compensa-

tion to the owners of the land for the taking. Shortly afterwards, the developer, the County Service Authority, and the Board of County Supervisors filed separate suits for just compensation. The government settled with the developer[1] and the Service Authority,[2] however defendant refused to negotiate meaningfully with the Board of County Supervisors for both liability and damages due plaintiff for the taking.

## II. Procedural History

Upon motion, this court held that the proffers were not "property" under the Fifth Amendment takings clause of the Constitution and, therefore, partially dismissed the County's claim. *Board of County Supervisors v. United States*, 23 Cl.Ct. 205 (1991). After a trial, this court dismissed the remainder of the claim, concluding that the County had failed to show any evidence of loss as a result of the taking because "the plaintiff's rights of way were irrevocably dedicated to non-profitable uses at the time of the taking." *Board of County Supervisors v. United States*, 27 Fed.Cl. 339, 348 (1992).

The Federal Circuit, upon appeal, affirmed-in-part this court's holding that the proffers did not constitute "property" under the Fifth Amendment and, therefore, were uncompensable. *Board of County Supervisors v. United States*, 48 F.3d 520, 526 (Fed. Cir.1995), *cert. denied*, 516 U.S. 812, 116 S.Ct. 61, 133 L.Ed.2d 24 (1995). The appellate court, however, reversed-in-part this court's holding that the 16.05 acres were without ascertainable value. *See id.* at 528. The Federal Circuit concluded that

> the argument of the United States regarding the difficulties inherent in determining the value of the property interests for which there is no market is beside the point. That argument presupposes that the County's estates in the land were not fee simple estates, but were estates encumbered by street rights of way, and that such interests can have no reasonably ascertainable value. As we have said, that presupposition is wrong. The interests held by the County in these five parcels, constituting 16.05 acres, are no different from the fee simple estates held by other owners of property within the William Center tract. We have considered the other arguments made by the United States, all of which build on the same supposition of burdened estates, and find them equally unpersuasive.

*See id.* The case was then remanded back to this court for determination of "just compensation due the County for the taking of its land which it held in unencumbered fee simple." *See id.* At this juncture in the litigation, it was abundantly clear that the property had some value; nevertheless, the government stubbornly adhered to its position that the land was virtually worthless.

Upon remand, this court heard oral arguments, including two expert appraisers, and permitted the parties to submit briefs on the matter. After considering this evidence, the court held that plaintiff was entitled to three dollars per square foot (hereinafter referred to as "p.s.f.") in just compensation and, in addition, $100,000 for improvements the County had made to the land prior to the taking. *Board of County Supervisors v. United States*, 34 Fed.Cl. 678, 681 (1996).

The Federal Circuit again reviewed this court's holding in this matter. *See Board of Supervisors v. United States*, 116 F.3d 454 (Fed.Cir.1997). The appellate court vacated the award for improvements on the land after holding that this court had erred as a matter of law, concluding that this amounted to compensating the condemnee for its investment, which was not a proper assessment of the fair market value of the property. The Federal Circuit further held that this court "erred as a matter of law in reading

---

1. *See NVHomes, L.P. and William Center, L.P. v. United States*, No. 607–89 L (final judgment entered on May 10, 1990, after settlement and joint stipulation filed); and *Perch Assoc., L.P., York, L.P., Tyson–McLean Assoc., L.P., Mason Assoc., General Partnership v. United States*, No. 610–89 L (final judgment entered on Dec. 18, 1990, after settlement and joint stipulation filed).

2. *See Prince William County Service Authority v. United States*, No. 90–312 L (final judgment entered on Nov. 20, 1992, after settlement and joint stipulation filed).

[the circuit's] decision as foreclosing an inquiry into whether the value of the 16.05 acres was different from the value of the surrounding land." *See id.* at 458. The circuit court noted that the real estate "at issue here consists of strips of land, rather than one large, easily developable tract." *See id.* In remanding the matter back to this court, the appellate court articulated that the question this court "must answer is, what is the fair market value of such odd pieces of land, taking into account their potential uses, current condition and the improvements thereon, and considering the most profitable uses to which the pieces of land can probably be put in the reasonably near future." *See id.* Finally, the Court of Appeals for the Federal Circuit observed that "[t]he fair market value of the surrounding land is only one factor to be considered. The burden rests on the County to prove to the court's satisfaction what the fair market value of the 16.05 acres [was]." *See id.*

## III. February 2000 Trial and Court Appointed Neutral Appraiser

This historical overview of the facts, issues and procedural chronology lays the foundation for the matter at hand. In light of the polarized positions of the parties on the issue of valuation after extensive litigation, and the highly suspect values assigned by prior expert witnesses, the parties agreed to a court appointed, neutral appraiser to assess the fair market value of the 16.05 acres. After an exhaustive search, the parties identified an appraiser and recommended his appointment by the court. After carefully considering this individual's qualifications,[3] the court accepted the parties' recommendation,[4] and issued an Order appointing William C. Harvey, II, CCIM, MAI, of William C. Harvey and Associates, Inc., Great Falls, Virginia, as its neutral appraiser. A two-day hearing followed.

To assure absolute fairness to both parties, the court requested several sets of proposed instructions from Mr. Harvey. The court additionally met with the parties on at least two occasions prior to trial in order to discuss the proposed instructions at length. As in all instances throughout the litigation of this case, the parties' approach to these discussions were discordant. During the course of appraisal instruction discussions, it became clear to the court that defendant was unreasonably insisting upon framing the appraisal instructions with meaningless requirements that had no bearing on the fair market value of the property, or with duplicative requirements that were already included in the proposed instructions. Mr. Harvey concluded, nonetheless, that he would address all of the issues the parties had concerning valuation in his recommendation report.

The court approved the final appraisal instructions[5] after full consultation with Mr.

---

**3.** *See* Record, Joint Status Report with attached qualifications of William C. Harvey, II, Filed January 07, 1998; *see also* Trial Transcript, February 09, 2000, at 35:24–43:22. During the trial, the court recognized Mr. Harvey as an expert witness, without objection by either party. *See id.* at 43:19–22.

**4.** *See* Record, Joint Status Report, Filed January 07, 1998.

**5.** The court order of September 25, 1998, manifested, in pertinent part, the following instructions:

. . .

**II. Specific Instructions**

1. The Property shall be valued as fee simple strips within the project known as the William Center, a 550–acre commercial and residential project for which the construction had begun as of the date of valuation.
2. The Property shall be valued as of the instant before title to it transferred to defendant on November 10, 1988, pursuant to the Manassas National Battlefield Park Amendments of 1988, 16 U.S.C. § 429(b) (1994).
3. Appraiser shall be permitted access to the entire record of this case and other materials deemed relevant, including all documents, drawings, and photographs of the Property and the William Center which describe the conditions of the Property immediately prior to the taking. Appraiser may also consult previous appraisals of the Property.
4. Appraiser shall not consider the purpose or motivation behind the legislative taking of the Property.
5. Appraiser shall not consider the way in which defendant currently uses the Property.
6. Appraiser shall not consider the amount defendant paid for the other adjoining property within the William Center tract as a result of the same legislative taking.

Harvey and the parties, and in consideration of the remand orders, and relevant case law.[6]

7. The fact that defendant acquired the Property by virtue of a legislative taking, as opposed to a more traditional exercise of eminent domain by an Executive Branch agency, shall have no impact on the determination of the Property's fair market value.

8. The fact that the Property was owned by a county, as opposed to a private property owner, shall have no impact on the determination of the Property's fair market value.

9. Appraiser will specifically determine and set forth in the appraisal the highest and best use to which the Property might reasonably have been devoted in the near future as of November 10, 1988. The term "reasonably near future" shall be determined without regard to the legislative taking of the Property that resulted in termination of the William Center project and transfer of the Property to defendant.

III. **Definitions, Standards, and Related Instructions**

1. "Fee simple estate" is defined as "absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat." Appraisal Inst., The Dictionary of Real Estate Appraisal 140 (3d ed.1993).

2. "Fair market value" is legally defined as the amount in cash, or on terms reasonably equivalent to cash, for which, in all probability, the Property would be sold by a knowledgeable owner willing, but not obligated, to sell to a knowledgeable purchaser who desires, but is not obligated, to buy. See Black's Law Dictionary 597 (6th ed.1990). When possible, Appraiser shall use this definition in developing the appraisal. Appraiser shall, however, default to the economic definition of fair market value set forth in Uniform Standards of Professional Appraisal Practice (U.S.P.A.P.) when the legal definition of fair market value does not specifically address an element of the appraisal.

3. The term "highest and best use" shall be defined as "[t]he reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest vale. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability." Appraisal Inst., The Dictionary of Real Estate Appraisal 171 (3d ed.1993).

4. Appraiser shall conduct the appraisal and develop his analysis, opinions, and conclusions in conformance with the following authorities:

Nevertheless, the government continued to insist that it would be prejudiced if the court

a. U.S.P.A.P. standards. See Appraisal Standards Bd., Uniform Standards of

b. Professional Appraisal Practice (1998).

c. Virginia real estate appraiser laws set forth in Title 54.1, Chapter 20.1 of the Code of Virginia. See Va.Code Ann. §§ 54.1–2009 to 2019 (Michie 1998).

d. Rules and regulations of the Virginia Real Estate Appraiser Board. See Department of Prof'l and Occupational Regulation, Real Estate Appraiser Board Rules and Regulations (1998).

e. The code and standards of the Appraisal Institute governing professional ethics and professional appraisal practice. See Appraisal Inst., Code of Professional Ethics of the Appraisal Institute (1994); Appraisal Inst., Standards of Professional Appraisal Practice of the Appraisal Institute (1994).

The above standards shall be deemed properly employed through the accepted texts and course materials of nationally recognized professional appraisal organizations.

5. Appraiser's analysis, opinions, and conclusions as to the highest and best use of the Property as of November 10, 1988 shall be developed in conformance with U.S.P.A.P. Standards Rule 1–3, and any contributory value of partially completed improvements shall be addressed therein.

6. The Property shall be valued by the "strip appraisal" approach, which is defined as an appraisal used to determine compensation based solely on the value of land and the contributory value, if any, of existing improvements in connection with a whole taking of real property that is comprised of contiguous parcels that have the same general characteristics, highest and best use, zoning, and the same land value.

IV. **Data Collection and Communication.**

1. Appraiser need not limit data collection to Prince William County and may use data that occurred five years before and five years after the effective date of the appraisal (November 10, 1988) if consistent or reflective of the market at the time of the take. Accordingly, the relevant market shall include Prince William County and its neighboring jurisdictions in Northern Virginia from the period from November 10, 1983 until November 10, 1993 . . .

---

6. See generally United States v. 819.98 Acres of Land, 78 F.3d 1468, 1471 (10th Cir.1996) (comparable market sales offer the best evidence of market value) (citations omitted ); Eastern Minerals International, Inc. v. United States, 39 Fed.Cl. 621, 626 (1997) (traditional method of determining market value is by using comparable sales) (citation omitted ).

failed to approve defendant's verbiage and duplicative version of the instructions. This fallacious charge did not sway the court. The neutral appraiser, whom the parties had mutually selected and approved, assured both the court and the parties at great length that each and every concern the government had would be thoroughly investigated and addressed in his evaluation.

## DISCUSSION

### I. Just Compensation and the Law of Takings

The United States, as an inherent aspect of its sovereignty, has the power to exercise eminent domain for public purposes. *See Kohl v. United States,* 91 U.S. 367, 371–372, 23 L.Ed. 449 (1875). When the government exercises this right, amounting to a taking, and thereby triggering the Fifth Amendment to the United States Constitution, just compensation is required. *See First English Evangelical Luth. Church v. County of Los Angeles,* 482 U.S. 304, 316, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987); *see also Kirby Forest Industries, Inc. v. United States,* 467 U.S. 1, 5, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984).

■ The proper measure of just compensation is the property's fair market value at the time of the taking. *See Kirby Forest Indus., Inc.,* 467 U.S. at 10, 104 S.Ct. 2187; *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470, 474, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973). The condemnee, or County in the instant matter, bears the burden of establishing the fair market value of the subject property. *See United States ex rel. Tennessee Valley Authority v. Powelson et al.,* 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). The established principles of property law holds that "[j]ust compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined ... The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered ... to the full extent that the prospect of demand for such use affects the market value while the property is privately held." *Olson v. United States,* 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934); *see also McCandless v. United States,* 298 U.S. 342, 345–46, 56 S.Ct. 764, 80 L.Ed. 1205 (1936).

■ In essence, the general rule is that any attribute of the subject property, that would effect the price a reasonable buyer would be willing to pay, should be considered in determining the fair market value. *See Almota Farmers Elevator & Warehouse Co.,* 409 U.S. at 474, 93 S.Ct. 791 (*citations omitted*); *United States v. Virginia Elec. & Power Co.,* 365 U.S. 624, 635–36, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961); *Olson,* 292 U.S. at 260, 54 S.Ct. 704; *Mitchell v. United States,* 267 U.S. 341, 343, 45 S.Ct. 293, 69 L.Ed. 644 (1925); and *Mississippi & Rum River Boom Co. v. Patterson,* 98 U.S. 403, 407–08, 25 L.Ed. 206 (1878).

The property at issue in this case, however, presents a formidable challenge to the court because of the nature of the real estate. The subject property is irregular in shape and consists of a variable-width strip of land which borders, on both sides, property previously owned by third parties. In determining just compensation of the subject property, the Federal Circuit directed this court to determine "the fair market value of such odd pieces of land, taking into account their potential uses, current condition and the improvements thereon, and considering the most profitable uses to which the pieces of land can probably be put in the reasonably near future." *Board of Supervisors of Prince William County,* 116 F.3d at 458.

### II. Fair Market Value Determination

Throughout the history of this case, a number of lay and expert witnesses have testified as to the fair market value of the oddly shaped pieces of land at issue. The court has previously ruled on the weight of credibility for some of these witnesses. Ben Kelsey, for example, was an expert appraiser who appeared on behalf of plaintiff who testified that streets should be appraised at the same value as the surrounding land.[7] The

---

7. Mr. Kelsey was provided with two fair market value estimates of the adjacent land to the sub-

court, however, accorded little credence to his testimony of just compensation of the property at issue because, according to Mr. Kelsey himself, he did not personally feel adequately qualified to appraise the land. *See Board of County Supervisors*, 34 Fed.Cl. at 680–81.[8]

Anthony Reynolds, also an expert appraiser, was called by both plaintiff and defendant in their cases-in-chief, during the 1992 trial. Mr. Reynolds opined that the average value of the subject property was $3.00 p.s.f. of land. However, since he considered that the land had a restricted use as a road and was therefore, not a fee *simple*, the subject property was only worth twenty-five percent of that dollar value.[9] *See Board of County Supervisors*, 34 Fed.Cl. at 681. The remainder, he concluded, was divided up between the value of the below-ground rights to exca-

vate and install sewers and cables, and the value derived from the value of the right to build on the land. When accounting for this percentage with the appraised dollar figure, the value of the land that the County owned would have been $0.75 p.s.f. *See id.*

At the second hearing, held in February 2000, two expert appraisal witnesses were called. Mr. Harvey testified as an expert witness in his court appointed capacity, as previously mentioned. He completed his appraisal in accordance with the court order issued on September 25, 1998,[10] which conformed with generally accepted appraisal practices.[11]

Mr. Harvey valued the subject property at $1.65 p.s.f. He arrived at this number by comparing the land in Prince William County to ten similar parcels in Fairfax and Prince William County, Virginia.[12] Mr. Harvey con-

---

ject property by Haynie S. Trotter, the lead attorney with the Prince William County Service Authority, No. 90–312 L, a related case, in completing his appraisal. The first FMV estimate, as provided by Mr. Trotter, was derived from the appraisal of Charles Moore, in the amount of $2.90 p.s.f., and the second was derived from the appraisal of Reynolds & Reynolds, in the amount of $3.25 p.s.f. *See* Record, Kelsey Deposition and Dep. Exhibits, at Exhibit 7; *see also Board of County Supervisors*, 34 Fed.Cl. at 680, *rev'd-in-part*, 116 F.3d at 456.

8. In 1992, Mr. Kelsey testified, in pertinent part, to the following:

I was the one who said I did not want to do an appraisal of the whole property. To me it was a massive job. I would have done a very large analysis of it, and then I would not have felt particularly qualified to do it, because I see it as an unusual property, and the question of whether it was ready to use would take a great deal of research and I didn't want to do an appraisal of it.

Transcript (Dec. 2, 1992) at 197.

The Federal Circuit has previously addressed the issue of land use restrictions burdened by the subject property. In 1995, the appellate court held that

the developer here, absent an express condition in the instrument of transfer sufficient to create an enforceable right against the County, retained no power to reclaim the land should the County fail of its purpose. *Absent such conditions* on the County's estates in the land, the County took in fee simple ... and was free as a matter of property law to do with the property what it wished.

*See Board of County Supervisors*, 48 F.3d at 527 (*emphasis added*).

This conclusion of law was further clarified in 1997 by the circuit, observing that this language specifically "addressed the issue of the County's legal rights with respect to the 16.05 acres." *See Board of County Supervisors*, 116 F.3d at 458. Thus, there does not exist an express condition in the instrument of transfer sufficient to create an enforceable right against the County. In light of the guidance provided by the circuit, the established principles of property law relevant to the instant case, and the prior rulings issued by the court in the case at bar, fair market value shall be determined in consideration of the fee simple quality inherent of the subject property.

9. In 1992, Mr. Reynolds testified, in pertinent part, to the following:

In this case the county owns the fee ... to me ... an appraiser ... it is misleading to say they have the—although they have the fee, they haven't the fee simple. They have, in fact, a very restricted fee in that others have use of the physical entity.

Transcript (Dec. 2, 1992) at 232.

10. *See* fn. 5.

11. *See* Trial Transcript, February 09, 2000, at 48:8–22 and 62:21–63:2. The court also notes that Mr. Harvey, after reviewing the court's prior holding and the earlier appraisal work completed by Anthony Reynolds on the surrounding land, agreed with the court's basis for determining the fair market value of the surrounding land to be $3.00 p.s.f. *See* Trial Transcript, February 09, 2000, at 66:8–21.

12. Mr. Harvey's opinion was initially arrived at by using these property comparables. A few

sidered and compared several factors, including *inter alia* the size, shape, and unimproved nature of the parcels; the highest and best use of the land; applicable zoning regulations; market conditions; and financing terms. He first opined that the Prince William County parcel was worth between $1.50 and $1.88 p.s.f., and finally concluded that the fair market value was $1.65 p.s.f.: totaling $1,153,578.00, as the fair market value of the subject property.

Mr. Harvey concluded that the highest and best use of the subject property was to assemble it with the surrounding lands, which he further opined was reasonably probable. As a PMD, this assemblage,[13] he determined, would reasonably be inclusive of residential, commercial, office, and/or recreational uses. He concluded that assemblage would be the highest and best use after considering the subject property's legal permissibility, physical possibilities, financial feasibility, and maximum productivity. For example, Mr. Harvey deduced that one of the factors important to this analysis was the consideration of "the character of the immediate neighborhood which the subject [property] was located in, along with the prevailing market conditions during the relevant periods." [14] This led him to believe that the subject property's market value would be raised due to the increased growth in the market in northern Virginia that were competitive and comparable to the William Center tract.

Mr. Harvey additionally provided the court with real estate comparables which closely resemble the subject property and which inferred a strong, reasonable probability that the subject property could have undergone changes prior to completion. For example, he specifically referenced two of his case studies at the February 2000 hearing that were representative of the general manner in which developments evolve over the course of time, to the point of changing the road maps of properties in the late planning stages and even initial development phases. One example Mr. Harvey introduced at trial was a parcel known as the Stonecrest property, which was close in space and time to the William Center tract that had experienced radical changes.[15]

The Stonecrest property illustrated an example of a piece of property located in Prince William County, Virginia, that underwent significant changes after initial development of roads and other improvements had already begun. The work was halted and the improvements were entirely removed to allow changes in the master plan. One of the major changes included realignment of a

days prior to trial, and after reviewing defendant's expert witness's report, Mr. Harvey submitted additional comparables in order to bolster his initial conclusions. Defendant objected to these later submitted comparables, arguing that defendant would be prejudiced by these late submissions. The government asserted that there was not enough time for their rebuttal expert witness to examine them prior to trial. Mr. Harvey's original opinion, however, regarding the fair market value and the highest and best use of the subject property, remained unchanged, even with the additional material provided to the court. The court reminded the parties that Mr. Harvey was a neutral, court appointed witness, and plaintiff had no objections to these late submissions. Further, the court reminded defendant that the government received the supplemental submissions at least five days prior to trial, whereas its own rebuttal expert witness took only ten days to complete his initial appraisal of the subject property, notwithstanding the fact that it was completed outside of the scope of the court's order for the appraisal work. After conferring with the both parties on this matter, the court concluded that defendant could have conducted a review of the supplemental comparables within a timely and reasonable fashion in preparation for trial. Plaintiff was allotted the same amount of time as defendant to conduct an independent review and analysis of these supplements, neither side had objection to Mr. Harvey being admitted as an expert witness, and Mr. Harvey's final opinions had not altered as a result of these supplemental comparables offered to the court. There was no prejudice to defendant.

**13.** Mr. Harvey used the term "assemblage" as derived from *The Dictionary of Real Estate Appraisal* 21 (3rd ed.1990), meaning, "The combining of two or more parcels, usually but not necessarily contiguous, into one ownership or use." *See also* Trial Transcript, February 09, 2000, at 184:10–24.

**14.** *See* Trial Transcript, February 09, 2000, at 50:10–14.

**15.** *See* Trial Transcript, February 09, 2000, at 52:25–55:21; and Trial Exhibits 8 & 9, Filed March 01, 2000.

street, which had previously been improved with a curb, cutter and partial paving. Mr. Harvey opined that the Stonecrest comparable was analogous to changes that the Prince William Center could reasonably have undergone, with respect to roads that were in existence, abandoned, and then changed due to market influences.

The second case study Mr. Harvey directed the court's attention to was known as the Braemer project in Prince Williams County, Virginia. This example depicted a road that was moved some 200 feet in order to accommodate necessary changes brought about by the developer. Road relocation was required, although expensive, in order to incorporate the ideas behind the master plan.

Both the Stonecrest and Braemer case studies, Mr. Harvey concluded, represented the type of changes that were typical in projects analogous to the Prince William Center development, whether in the planning phase or in the construction stage. Mr. Harvey further explained that such conditions represented 'living projects' throughout their planning and developmental stages, and in no way were 'static' in nature. Expounding on this, he testified that "by extension, the need for changes at these projects in both the orientation of the internal uses by virtue of their mix, by the quantification, the acreage devoted to any one given mix, and the need for flexibility of the planning of the roads would have to be extended to the subject."[16]

These conclusions were supported by the testimony of Susan Roltsch, the Chief of Development Services for Prince William County, Virginia. In this capacity, Ms. Roltsch's office was responsible for overseeing all of the new land development applications submitted to the County. Ms. Roltsch testified that the location of streets often changed as originally planned for the developments.[17] In fact, she explained that subdivision plats[18] are often altered many times through administrative actions in plats of vacation, plats of rededication and plats of new subdivision.[19] She fully supported Mr. Harvey's testimony by noting that it was common for General Development Plans, similar to the one drafted for the William Center Boulevard, to change because they are conceptual, nonspecific documents which must necessarily allow for redesigning room in the overall spirit of the plan.[20]

In addressing the nominal improvements already made on the subject property, Mr. Harvey resolved that the

improvements would have paled in significance to the financial ramifications of keeping the original plan that was no longer responsive to market conditions, and it was that need that I addressed throughout the test of highest and best use when I determined that it was reasonably probable that a hypothetical buyer would orient to the subject property as most likely to be used with the adjoining land as mixed uses that were allowed throughout the linear length of the subject, which would have included both residential, commercial, retail, a portion would still be used as a road, but I don't believe that a prudent purchaser would specifically look at the subject as only a road, cognizant of the history of change in all the competing projects.[21]

. . .

The fact that you have a road for something that is no longer a demand doesn't justify the road. What does justify the future activity at that project is to meet the current and reasonable demands that would warrant development. . . . to that end . . . the primary consideration would be what's the best use of the surrounding land, and if it involved change in the road,

---

16. *See* Trial Transcript, February 09, 2000, at 59:6–11.

17. *See id.* at 425:10–12.

18. *Ms.* Roltsch explained that a 'subdivision plat' was an engineering document which showed the exact location of property; e.g., boundaries and easements. *See id.* at 426:15–17.

19. *See id.* at 426:20–427:2; *compare with* Mr. Harvey's testimony, at 218:5–8.

20. *See id.* at 426:1–9 and 216:22–24.

21. *See id.* at 59:25–60:13; *see also* 120:1–121:2; 151:18–152:3.

so be it, regardless of its improvement status.[22]

In arriving at his opinion, that assemblage was the highest and best use of the subject property, Mr. Harvey also accounted for the necessary 'meeting of the minds' between the owners of the adjacent land and the subject property, of the commonality or common interest in the use of these properties. He concluded that there would indeed be agreement between the hypothetical buyer and the hypothetical seller about the relocation, or partial relocation, of roads through assemblage of the subject property with the surrounding land.

Notwithstanding the fact that the government had fully participated in the selection of Mr. Harvey as the court's expert witness and reasonable safeguards had been placed in the court's instructions to address all of defendant's concerns regarding the appraisal performed by Mr. Harvey, the government, not unsurprisingly, took issue with his conclusions because they did not agree with the dollar value recommended by Mr. Harvey to the court. The government has taken a strenuous litigation posture in this case despite being extremely generous in its settlement negotiations with the developer regarding its initial taking over ten years ago. For a number of years the government argued forcefully that the 16.05 acres at issue were worthless, or of "nominal value only," and had refused to negotiate meaningfully with plaintiff in the numerous court-sponsored settlement conferences. This recalcitrant position has cost plaintiff and the judicial system much frustration and unnecessary costs. Now, after three trials, and two appeals, the government has seemingly relented to the point of recognizing that the property might indeed have some value, but certainly far less than that recommended by Mr. Harvey. Although mutually agreed upon by both parties as a fair and adequate method of evaluating the best

and highest use of the land, the government did not agree with the final appraisal reported by him, and hired its own appraiser for the purpose of discrediting Mr. Harvey's report.

In response to this "concern" of the government, the court was constrained to listen to yet another witness' attempt to impeach the testimony of the court's expert witness.[23] The government called upon David C. Lennhoff, MAI, SRA, Senior Vice President and Director of Appraisal Services for Delta Associates, of Bethesda, Maryland. Mr. Lennhoff's background initially did entitle him to recognition as an expert in the area of real estate appraisal and valuation. However, upon review of his subsequent testimony and summary appraisal report, marked at trial as exhibit No. 2, the court accords very little to no weight to this witness.

While recognizing that experts in the same field of discipline may disagree with one another, the court has broad discretion, as trier of fact, to determine issues of credibility. *See Santa Fe Engineers, Inc. v. United States*, No. 270–79 C, 1980 WL 20837, *7 (Cl.Ct.1980), *aff'd* 652 F.2d 70, 227 Ct.Cl. 623, 1981 WL 139593 (1981). Although an apparent expert in his field, Mr. Lennhoff's appraisal and his analysis of Mr. Harvey's testimony considered irrelevant issues which fell outside the scope the appraisal instructions, as agreed to by both parties and directed by the court. As previously mentioned, the court issued an order instructing Mr. Harvey of specific limitations to his appraisal of the subject property. This included, *inter alia*, place and time restraints, i.e., "Prince William County and its neighboring jurisdictions in Northern Virginia from the period from November 10, 1983 until November 10, 1993."[24] The scope of Mr. Lennhoff's appraisal considered properties in Maryland, and properties transferred beyond the 1993

---

**22.** *See id.* at 157:11–19.

**23.** The court verbally issued this order, limiting the parties' expert witnesses to impeachment testimony only, at the telephonic pretrial conference, held without the presence of a court reporter, on February 03, 2000, and reiterated this

order during pretrial motions heard on February 09, 2000. *See* Trial Transcript, February 09–10, 2000, at 9:1–3 and 25:20–23.

**24.** *See* fn. 3, at § IV(1) (*emphasis added*).

time period.[25] When asked about this, Mr. Lennhoff stated that he had been aware of the court's order limiting the appraisal[26] but that he had been told by government counsel that if *he* thought other data might help the court, and implicitly advance his counter-appraisal, *he was free to* use the Maryland comparables.[27] Mr. Lennhoff, in an attempt to resesutate his testimony, explained that the Maryland comparables were "peripheral" to his conclusion that the subject property was of nominal value.[28] Nevertheless, they were not withdrawn by defendant.

This line of reasoning neither excuses the witness nor the government for submitting appraisal work outside the metes and bounds of the court's order to which the government had agreed and was, thereinafter, confined. The court takes note of the fact that Mr. Lennhoff was an expert hired by defendant and, therefore, was under the charge of the government to perform his appraisal. It was the government that submitted his report to the court and implicitly, if not explicitly, encouraged him to ignore the court's instructions. If the government intended to offer evidence that was clearly outside the bounds of the court's order, then defendant ought to have motioned the court for variance. Intentionally failing to comply with the court's order greatly diminished this expert's valuation opinion of the subject property.

Further, the court finds that Mr. Lennhoff had been hired by the government with specific motivation to discredit Mr. Harvey's appraisal prior to completing an independent appraisal of his own. Valuing the subject property is a very complex and time-consuming process; though the partisan attempt to critique Mr. Harvey's valuation was a relatively simple matter. Had Mr. Lennhoff been hired at the outset to perform an independent appraisal, pursuant to the court's limiting instructions, his findings would have gained greater credibility with the court. However, critiquing another's work in these circumstances gives an ample appearance of subjectivity to a later performed 'objective' appraisal completed by the same person, which taints the reviewer's latter work. This outcome emerges because the witness has the appearance of subjectivity, i.e., he is more interested in bolstering the conclusions of his own critique, with his subsequently performed appraisal. This constituted a classic example of an organizational conflict of interest and any inconsistent findings between Mr. Lennhoff's two analyses would result in diminished credibility of both. Mr. Lennhoff was unrelenting in his attack upon Mr. Harvey's analysis, finding hardly a single aspect of his report with which he agreed. Mr. Lennhoff's arrogance was obvious in his attack, not only by his feeble attempts at thwarting Mr. Harvey's valuation, but also by his assault on the other appraisers who had valued the subject property. These factors compel the court to give greater weight to the testimony of the mutually agreed upon court-appointed appraiser who conducted a neutral, objective appraisal at the outset, as opposed to Mr. Lennhoff's testimony which appeared late in the day with a preconceived mandate from the government to discredit Mr. Harvey, without regard to the veracity of his findings.

Mr. Lennhoff erroneously presupposed that the subject property had only a nominal value, without completing an actual inquiry into the fair market value of the parcel strips. He stated in his report that the subject property, if used as a transportation corridor, had only nominal value. However, the court again draws its attention to the mishandling by defendant's counsel and witness of the court's limiting instructions. Mr. Lennhoff arrived at this conclusion after a review of transportation corridors in Maryland, not in northern Virginia. Although Mr. Lennhoff may have had adequate reason for these comparisons as an expert in his field of discipline, defendant and their expert witness were both cognizant of the court's limiting instructions to restricting comparables to

**25.** *See* Record, Trial Transcript, February 10, 2000, at 344:4–345:9.

**26.** *See id.* at 349:23–25.

**27.** *See id.* at 349:5–11.

**28.** *See id.* at 349:14–19.

northern Virginia, and the reasons therefore.[29]

Inherent in such outright and blatant disregard for the court's order is a bias towards the opposing party because they are unable to properly review and conduct discovery outside the scope of the court's instructions. Civil litigation has, in the modern American legal system, opened its doors to broad discovery rules, permitting generally unobstructed access of information to all interested parties. This liberal portal to information provides a valuable asset to the parties in arriving at a litigation and settlement strategy. An attempt to evade this long and well established policy has the effect of diluting fairness and equity from the marble pillars of justice by which this nation was founded upon. An ignoble endeavor which shall not be tolerated.

Further, Mr. Lennhoff considered whether or not the subject property would have actually been relocated, had there not been a taking. Mr. Lennhoff asserted he interviewed several individuals who had been connected to the development of property at issue and concluded that the subject property's original purpose would not have actually been altered from its dedication plan as a road. These factors were considered at length by Mr. Lennhoff in determining whether or not a reasonable probability existed for determining the subject property's highest and best use.

■ This line of reasoning is plainly flawed. Plaintiff bears the burden of proving what the fair market value of the subject property was at the instant moment prior to the taking, "considering the most profitable uses to which the pieces of land can probably be put in the reasonably near future." *Board of County Supervisors*, 116 F.3d at 458. This valuation is an objective one and, therefore, a proper analysis thereof should not be solely determinative based upon what course of action the owners of such land would have 'actually' undertaken. The owners of the land may have let the land lay fallow, much less have utilized it for its highest and most profitable use.

Evidence of what the property was probably going to be used for in the near future only demonstrates one aspect of this charge; i.e., this showing offers proof as to one possible use in the near future. The determination, rather, ought to have been properly based upon what the highest and most profitable use would have been at the moment prior to the taking, which was not necessarily what the property owner probably would have used it for. *See Olson v. United States*, 292 U.S. at 255, 54 S.Ct. 704 ("[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered ... to the full extent that the prospect of demand for such use affects the market value while the property is privately held").

Defendant's consideration of how the land would actually have been used becomes irrelevant, therefore, because Mr. Lennhoff's investigation was not a thorough inquiry as to the highest and most profitable use of the subject property. Notwithstanding his detailed criticisms of Mr. Harvey, Mr. Lennhoff failed to complete his own examination. He ceased his research after his interviews with those concerned with the project prior to the taking. In so doing, Mr. Lennhoff merely demonstrated one factor; that is, he showed that the subject property could have been used as a roadway around the time of the taking. This demonstrative exercise, however, failed to take other relevant factors into consideration, thereby making his analysis incomplete as to whether or not the roadway purpose was the highest and most profitable use of the subject property at the time of the taking.

The court additionally notes that both Mr. Lennhoff and Mr. Harvey admitted to having factual errors in their appraisal reports; however, the court is satisfied that Mr. Harvey was able to correct the errors in his report so that his final appraisal of the sub-

29. *See* Record, Trial Exhibit no. 2, at 19. The court takes notice that the government never objected to limiting comparables to Northern Virginia. Not once did the government suggest that Maryland comparables be included in the instructions, even though counsel expressed other (meritless) dissatisfaction with other issues.

ject property was not effected. Mr. Lennhoff's report and valuation is still plagued with the deficiencies mentioned above and has not been corrected to the satisfaction of the court.

For the aforementioned reasons, the court accords no credence to Mr. Lennhoff's testimony and summary report concerning the fair market value of the subject property.

## CONCLUSION

■ As trier of fact, the court is dutifully charged with the task of arriving at the fair market value of the subject property, considering the highest and most profitable use near the time of the taking. This court has jurisdiction of cases that are often complex in nature; however, no matter how compounded the issues in these cases, the court urges the parties to attempt to resolve their differences through negotiation. Settlements are reached, for the most part, either with the aid of the court or through independent means of the parties. This case, unfortunately, has embarked on a different path.

Throughout the prolonged and 'unsettling' history of this matter, the parties have unremittingly failed to reach an agreement. Even after the case had been twice remanded and a mutually agreed upon court appointed appraiser had submitted his report, the parties were still at odds with each other. Although this happens for a myriad of reasons, some even justifiable, many times it is due to the obstinate, unwavering will of one or both parties to take a firm grip on a particular position, and unrelentingly refuse to let go.

These circumstances are unfortunate, causing undue delay of the administration of justice, and unnecessary time, energy, resources and stress to both parties, not to mention to the court. Such is the instant case before the court. At the outset, defendant argued that the property had no value, or at best some nuisance value, because of a fallacious assumption that the land was not the County's in fee simple; rather, it was burdened by restraints that diminished its value to nil. Defendant asserted, that no compensation was due plaintiff for the taking of land having no value.

When the case was argued for the third time, defendant postured that the subject property had some nominal value after considering an appraisal summary report performed by its witness. The government arrived at this decision after concluding the subject property could only be used as a roadway and was unlikely to be assembled to the adjacent lands. In doing so, defendant offered to this court its witnesses' valuation of the subject property's highest and best use of $205,000. In other words, the government's position shifted; for the first time after ten years it acknowledged the property was not valueless but was, in fact, worth $0.15 p.s.f.

Although blame should not solely be cast on the government for the lethargic disposition of this matter, the case could possibly have been disposed of at a much earlier stage in the proceedings had defendant considered a more objective appraisal approach of the subject property from the genesis of this case.

After years of practice in the field of law, President Abraham Lincoln scripted the following advise for his fellow advocates: "Discourage litigation. Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often the real loser—in fees, expenses, and waste of time. As a peacemaker the lawyer has a superior opportunity of being a good man."[30] It is in this vein that the court strongly urges the parties, in this case and others, to be cognizant of this country's dictate of fairness and equity. Holding strong to a position for the sole purpose of claiming a win, no matter right nor wrong, does only disserve to the administration of justice.

That being said, this court is reminded that it must remain objective and fair in carrying out the task at hand. In doing so, the court has reviewed the entire record in this matter, from the time the initial pleadings were filed some ten years ago until the final post-hearing briefs were submitted by the parties in this third hearing. Therefore,

**30.** Abraham Lincoln, Notes for a Law Lecture (July 1, 1850).

the court finds that the fair market value of such odd pieces of land, taking into account their potential uses, current condition and the improvements thereon, and considering the most profitable uses to which the pieces of land can probably be put in the reasonably near future is $1.65 p.s.f.

## DISPOSITION

For these reasons, plaintiff is entitled to just compensation in the amount of $1.65 per square foot for the 16.05 acres which the Federal Government took by eminent domain pursuant to the Manassas National Battlefield Park Amendments of 1988.

Interest shall be paid according to 16 U.S.C. § 429(b)(2)(B).

**IT IS SO ORDERED.**