BOARD OF COUNTY SUPERVISORS
OF PRINCE WILLIAM COUNTY,
VIRGINIA, Plaintiff–Appellee,

v.

UNITED STATES, Defendant
Appellant.

No. 01–5030.

United States Court of Appeals,
Federal Circuit.

Jan. 16, 2002.

Gifford R. Hampshire, Office of the County Attorney, Prince William County, Prince William, VA, argued for plaintiff-appellee. With him on the brief were Sharon E. Pandak, and Ross G. Horton.

Robert H. Oakley, Attorney, Environment and Natural Resources Division, Department of Justice, of Washington, DC,

argued for defendant-appellant. With him on the brief was John C. Cruden, Acting Assistant Attorney General.

Before MICHEL, RADER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

The United States appeals from the final judgment of the United States Court of Federal Claims in *Bd. of County Supervisors v. United States,* 47 Fed. Cl. 714 (2000). The judgment awarded the Board of County Supervisors of Prince William County, Virginia, compensation in the total amount of $1,153,578.00 for the 16.05 acres of land which the federal government took from the County by eminent domain. The government took the land pursuant to the Manassas National Battlefield Park Amendments of 1988, Title X of the Technical and Miscellaneous Revenue Act of 1988, Pub.L. No. 100–647, 102 Stat. 3342, 3810 (1988) (codified at 16 U.S.C. § 429b(b) (1988)). We affirm.

### BACKGROUND

This case has been before us on two previous occasions. *See Bd. of County Supervisors v. United States,* 48 F.3d 520 (Fed.Cir.1995) ("*Bd. of County Supervisors I* "); *Bd. of County Supervisors v.. United States,* 116 F.3d 454 (Fed.Cir.1997) ("*Bd. of County Supervisors II* "). For a detailed account of the facts, the reader is referred to our previous opinions in the case. Only those facts material to our present decision are discussed in this opinion.

### I.

In 1986, a developer purchased an undeveloped 550–acre tract of agricultural land in Prince William County, Virginia. *Bd. of County Supervisors I,* 48 F.3d at 522. In order to obtain rezoning of the tract (which it called the "William Center"), the developer submitted "proffers" to the Prince William County zoning authority. *Bd. of County Supervisors v. United States,* 27 Fed. Cl. 339, 340 (1992). Proffers are commitments made by a developer to mitigate anticipated development impacts. *Id.* The developer's proffers in this case included a number of obligations, one of which was the developer's agreement to convey to the County five narrow strips of land, totaling 16.05 acres, and then to build on the transferred land a road. *Id.* The road was to be named the "William Center Boulevard."

When the developer proposed to construct a much larger development on the tract than originally anticipated, a citizens' coalition persuaded Congress to enact the Manassas National Battlefield Park Amendments of 1988 (the "Act"). 16 U.S.C. § 429b(b)(1988). The Act vested in the United States all rights to the developer's tract and to the 16.05 acres owned by the County. *Bd. of County Supervisors I,* 48 F.3d at 522. The Act concomitantly obligated the United States to pay just compensation for the land. *Id.*

In due course, the developer and the County filed separate suits in the Court of Federal Claims seeking compensation under the Act. *Id.* at 523. The United States settled the developer's suit, but declined to pay the County the $2 million it sought for the 16.05 acres. *Id.* After a trial, the Court of Federal Claims issued an opinion holding that the strips of land were burdened with a road-use condition and that the strips' dedication to a non-profitable use rendered them essentially valueless. *Bd. of County Supervisors v. United*

*States,* 27 Fed. Cl. 339 (1992). The County appealed the decision to this court.

We reversed the Court of Federal Claims decision, holding that absent an express requirement that the land be used for roads, the "County took in fee simple ... and was free as a matter of property law to do with the land what it wished." *Bd. of County Supervisors I,* 48 F.3d at 527. We remanded to the trial court "for further proceedings to determine the just compensation due the County for the taking of its land which it held in unencumbered fee simple." *Id.* at 528.

On remand, following briefing and oral argument, the Court of Federal Claims decided the compensation issue based upon the record developed in the prior proceedings. The court awarded the County compensation at a rate of three dollars per square foot. *Bd. of County Supervisors,* 34 Fed. Cl. 678, 681 (1996). Three dollars per square foot was the rate Mr. Hanie Trotter, an attorney with the County Service Authority, used at trial in estimating the value of the entire 550–acre tract. *Id.* at 680. The court also awarded the County an additional $100,000 for road improvements made to the land prior to the taking, bringing the total award to $2.2 million. *Id.* at 681. The United States appealed a second time, challenging the methodology that the Court of Federal Claims had used in valuing the narrow strips at the same rate as the surrounding property and objecting to the $100,000 award for road improvements.

We again reversed the trial court, holding as follows:

> [T]he Court of Federal Claims erred as a matter of law in reading our decision as foreclosing an inquiry into whether the value of the 16.05 acres was different from the value of the surrounding land.

The point is that the property at issue here consists of strips of land, rather than one large, easily developable tract. The question the Court of Federal Claims must answer is, what is the fair market value of such odd pieces of land, taking into account their potential uses, current condition and the improvements thereon, and considering the most profitable uses to which the pieces of land can probably be put in the reasonably near future. The fair market value of the surrounding land is only one factor to be considered. The burden rests on the County to prove to the court's satisfaction what the fair market value of the 16.05 acres is.

*Bd. of County Supervisors II,* 116 F.3d at 458.

We also vacated the award of $100,000 for road improvements. We concluded that the award was not a component of the fair market value of the property and amounted to impermissibly compensating the condemnee for its investment. *Id.* We remanded the case to the Court of Federal Claims for a new determination of the fair market value of the property. *Id.*

## II.

On remand, the Court of Federal Claims ordered the parties to agree upon one neutral appraiser to value the 16.05 acres at issue. The parties agreed on William C. Harvey, II. The court accepted the parties' recommendation, and issued an Order appointing Mr. Harvey as its neutral appraiser. *Bd. of County Supervisors v. United States,* 47 Fed. Cl. 714, 717 (2000).

A two-day trial was held in February of 2000, at which several witnesses testified. Mr. Harvey, appearing as an expert witness in his court-appointed capacity, testi-

fied that he valued the 16.05 acres at $1.65 per square foot for a total value of $1,153,578. Mr. Harvey's appraisal was based on his conclusion that the highest and best use of the 16.05 acres when it was taken by the government was to assemble it with the surrounding land and then develop the resulting parcel for the mixed uses that were allowed by the planned mixed development zoning classification then in effect. He further testified that this proposed use was reasonably probable.

Susan Roltsch, the Chief of Development Services for Prince William County, also testified. Ms. Roltsch stated that her office was responsible for overseeing all of the new land development applications submitted to the County. She testified that the locations of streets in new developments often change from their originally planned locations, as initially shown in a general development plan.

Testifying for the government were an independent government-hired appraiser, David C. Lenhoff, and the chief developer of the William Center, John T. Hazel. Mr. Lenhoff testified that he valued the 16.05 acres at $205,000, based on his conclusion that the property could only be used as a road. Mr. Hazel testified regarding the time and money spent constructing and choosing the optimum location for the William Center Boulevard (the 16.05 acres at issue).

The Court of Federal Claims accepted Mr. Harvey's conclusion that the highest and best use of the 16.05 acres was to assemble it with the surrounding land and then complete a development for mixed uses. From there, the court held that, at the time the 16.05 acres was taken, the fair market value of the land, taking into account its potential uses, its condition, and the improvements on it, and considering the most profitable uses to which it could probably be put in the reasonably near future, was $1.65 per square foot, consistent with Mr. Harvey's appraisal. *Bd. of County Supervisors,* 47 Fed. Cl. at 727 (2000). The government timely appealed the court's decision. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

### I.

■ In reviewing a decision of the Court of Federal Claims after a trial, we review conclusions of law *de novo* and findings of fact for clear error. *Shelden v. United States,* 7 F.3d 1022, 1026 (Fed.Cir. 1993).

The government contends that the Court of Federal Claims erred in finding that the highest and best use of the 16.05 acres was assemblage with adjoining properties. Attacking the sufficiency of the evidence, the government argues that there was no factual basis for the court's conclusion that assemblage of the 16.05 acres with the adjoining property was reasonably probable.

To support its argument, the government contends that a Virginia statute, Virginia Code § 33.1–151, only allows a road to be abandoned if alternate routes are available. The government asserts that, at the time of the taking, the 16.05 acres at issue provided the only road access to the William Center development. Accordingly, the government argues, if the County had sold the property, the County or the purchaser would have been required to provide a replacement road at a new location for accessing the William Center development. The government asserts that

such a sale would not have been reasonably probable because it would not have been financially feasible to move the William Center Boulevard to a new location.

In making its argument, the government points to the testimony of the original developer, Mr. Hazel. Mr. Hazel testified that he could not "imagine" why "anyone would ... relocate that road" because (i) the planned location of the road had been determined after a year of study, (ii) at least half a million dollars in engineering and consulting fees had been spent in locating the road, (iii) the construction of the road already had been bonded in excess of $2 million, (iv) the road already had been dedicated to the County, and (v) the topography of the land prevented the road from being moved to a new location.

Thus, the government argues that it was not reasonably probable that the County would have sold the 16.05 acres at issue for assemblage with the adjoining land, because providing a new replacement road for the William Center development would not have been financially feasible.

## II.

In the Court of Federal Claims, the County, as the condemnee, had the burden of establishing the value of the 16.05 acres. *See United States ex rel. TVA v. Powelson*, 319 U.S. 266, 273, 63 S.Ct. 1047, 87 L.Ed. 1390 (1943). The value of the condemned property is an issue of fact. *Pennsylvania Ave. Dev. Corp. v. One Parcel of Land in District of Columbia*, 670 F.2d 289, 293 (D.C.Cir. 1981).

As compensation for the condemnation, the County is entitled to the value that the 16.05 acres would have command-ed in the open market at the time of the taking in light of the highest and most profitable use to which the acreage might reasonably have been devoted in the near future. *See Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934). In *Olson*, the Supreme Court stated that the condemnee is to receive:

the market value of the property at the time of the taking contemporaneously paid in money.... Just compensation includes all elements of value that inhere in the property, but it does not exceed market value fairly determined.... The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held.

*Id.* (citations omitted); *See also McCandless v. United States*, 298 U.S. 342, 345–46, 56 S.Ct. 764, 80 L.Ed. 1205 (1936) ("The rule is well settled that, in condemnation cases, the most profitable use to which the land can probably be put in the reasonably near future may be shown and considered as bearing upon the market value.").

The highest and most profitable use for the County's 16.05 acres may be found to have been a use in combination with other parcels, so long as there was a reasonable probability that the parcels would have been so combined in the reasonably near future. *See Powelson*, 319 U.S. at 275–276, 63 S.Ct. 1047. In *Powelson*, the Supreme Court stated:

[T]he value [of the condemned lands] may be determined in light of the special or higher use of the land when combined with other parcels; it need not be mea-

sured merely by the use to which the land is or can be put as a separate tract. But in order for that special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future. In absence of such a showing, the chance of their being united for that special use is regarded as too remote and speculative to have any legitimate effect upon the valuation.

*Id.* (citations omitted); *See also Olson,* 292 U.S. at 256, 54 S.Ct. 704 ("The fact that the most profitable use of a parcel can be made only in combination with other lands does not necessarily exclude that use from consideration if the possibility of combination is reasonably sufficient to affect market value.").

█ Thus, a proposed "use" requires a showing of reasonable probability that, at the time of the taking, the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future. *See United States v. 341.45 Acres of Land,* 633 F.2d 108, 111 (8th Cir.1980). In the decision below, the Court of Federal Claims prop-

erly recognized this legal framework. The court found that there was a reasonable probability that the 16.05 acres was physically adaptable for assemblage with adjoining properties, and also that there was a demand for assemblage at the time of the taking.[1] At the same time, the appraisal instructions provided to Mr. Harvey prior to his appraisal properly incorporated this legal framework.[2]

## III.

We conclude that there is sufficient evidence in the record to support the Court of Federal Claims' decision. Mr. Harvey testified at trial that he compared the 16.05 acres at issue to ten similar parcels of land in Prince William County and nearby Fairfax County, Virginia. Those parcels are described in his appraisal report. The ten parcels were originally intended for use as roads, but were sold by the Commonwealth of Virginia to adjoining landowners as excess pieces of land not needed for road construction. Mr. Harvey testified that, in making his appraisal, he considered the size and shape of the 16.05–acre tract, its conformity with the surrounding land, zoning restrictions on the property,

---

1. Courts in some jurisdictions allow consideration of evidence of assemblage only if all the parcels to be assembled are owned by the same party. *See* 4 J. Sackman, Nichols on Eminent Domain § 13.02[9] (rev.3d ed.2001). The government does not ask us to adopt such a rule in this case.

2. Appraisal instructions II.9 and III.3 provided to Mr. Harvey are particularly relevant: II.9. Appraiser will specifically determine and set forth in the appraisal the highest and best use to which the Property might reasonably have been devoted in the near future as of November 10, 1988. The term "reasonably near future" shall be determined without regard to the legislative taking of the Property that resulted in termi-

nation of the William Center project and transfer of the Property to defendant.
III.3. The term "highest and best use" shall be defined as "[t]he reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value. The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability." Appraisal Inst., The Dictionary of Real Estate Appraisal 171 (3d ed.1993).
*Bd. of County Supervisors v. United States,* 47 Fed. Cl. 714, 717 n. 5 (2000).

the character of the immediate neighborhood, and marketing conditions in the relevant market at the relevant time. These considerations are reflected in his appraisal report.

◼ Mr. Harvey also provided eight "case studies" that he stated were examples of development projects that ultimately used property previously planned for a road for a different purpose. For example, during construction of one those projects, known as the "Stonecrest" development, the developer removed a road that was already improved with a curb, gutter, and partial paving to allow for changes in the master plan that required realigning the road. The case studies demonstrate that the planned locations of roads, including roads that are already partially constructed, sometimes change during construction of a development. In addition, Ms. Roltsch testified that the locations of streets in new developments often change from their originally planned sites. All of this evidence supports the Court of Federal Claims' finding that there was a reasonable probability that, at the time of the taking, the 16 .05 acres were physically and legally adaptable for assemblage with adjoining properties, and that there was a demand for assemblage at the time of the taking.

◼ The government argues, however, that at the time of the taking, the County had no intention of selling the 16.05 acres or using the 16.05 acres for a purpose other than a road. We do not believe this line of argument helps the government. The Court of Federal Claims properly recognized that the County's intended use for the 16.05 acres was not the only consideration in determining the highest and most profitable use for the property. *See Bd. of*

*County Supervisors,* 47 Fed. Cl. at 725. The proper inquiry is what the highest and most profitable use for the property was at the moment prior to the taking, based on a showing of reasonable probability that the land was both physically adaptable for such use and that there was a need or demand for such use in the reasonably near future. *See Olson,* 292 U.S. at 255, 54 S.Ct. 704 ("[t]he highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered ... to the full extent that the prospect of demand for such use affects the market value while the property is privately held."). "The owner may introduce evidence of the highest and best prospective use even though he has no plans to sell the property or utilize it for that use." 5 J. Sackman, Nichols on Eminent Domain § 18.05[3] (rev.3d ed.2001).

◼ Neither do we agree with the government's argument that Va.Code § 33.1–151 would have required the County to provide a replacement road at a new location for accessing the William Center. The Virginia statute reads in relevant part as follows:

> The governing body of any county ... may cause any section of the secondary system of highways ... deemed by it to be no longer necessary for the uses of the secondary system of highways ... to be abandoned altogether as a public road....
>
> If ... the governing body is satisfied that no public necessity exists for the continuance of the section of the secondary road as a public road ... or that the safety and welfare of the public would be served best by abandoning the section of road, ... it shall enter ... an order on its minutes abandoning the sec-

tion of road as a public road ... and thereupon the section of road shall cease to be a public road....

A finding by the governing body of a county that a section of the secondary system of highways is no longer necessary for the uses of the secondary system may be made if the following conditions exist:

A. The road is located within a residence district as the latter is defined in § 46.2–100;

B. The residence district is located within a county having a density of population exceeding 1,000 per square mile;

C. Continued operation of the section of road in question constitutes a threat to the public safety and welfare; and,

D. Alternate routes for use after abandonment of the road are readily available.

Va.Code § 33.1–151.

Va.Code § 33.1–151 would not have operated to require the County to provide a replacement road for the William Center Boulevard. The reason is that, by its terms, the statute applies to already constructed roads in the Virginia secondary system of highways, not to partially constructed street improvements such as the 16.05 acres at issue here. Va.Code § 33.1–151 therefore presented no restriction on the County's ability to sell the 16.05 acres to adjoining landowners.

## IV.

Finally, the government argues that the Court of Federal Claims misconstrued this court's opinion in *Bd. of County Supervisors I* by failing to consider whether contractual restrictions would have prevented the County from selling the 16.05 acres. Specifically, the government contends that two footnotes (15 and 17) in *Bd. of County Supervisors I* indicate that this court left open the question of whether the County was contractually prevented by its proffer agreement with the developer from selling the 16.05 acres at issue. In the footnotes, the court stated that it was expressing no view as to whether the developer would have had a cause of action against the County for damages or for rescission, based on breach of contract or similar theory, if the County had decided not to use the property as a road.[3]

■■■ We do not agree that these two footnotes in *Bd. of County Supervisors I* left unresolved the issue of whether the County was contractually prevented from selling the 16.05 acres. The pertinent portion of the *Bd. of County Supervisors I* opinion reads as follows:

On the record before us, it does not appear that there was anything in the deeds or the dedications that expressly limited the conveyed interests to road improvement purposes.... It matters not that the parties contemplated that the property would be used for a particular purpose. If an owner of land conveys it in fee simple to a buyer who, it is understood, will build a traditional Cape Cod upon it, and instead the buyer builds a contemporary manse, can the

---

**3.** Footnotes 15 and 17 read as follows:

Footnote 15: "We offer no view about the potential of a suit for damages or rescission for breach of contract. And of course the question of publicly-imposed restrictions, such as architectural restrictions, is a separate question." 48 F.3d at 528 n. 15.

Footnote 17: "Again, we do not offer any views on whether the developer might have had a cause of action against the County for damages or for rescission, based on breach of contract or some similar theory, should the project have proceeded and the County have failed to build the expected road improvements." *Id.* at 528 n. 17.

transferor claim the title does not permit that choice? Absent an express condition in the deed, such as those we have described, or some enforceable restrictive covenant imposed by deed or dedication, the choice is the new owner's. [Footnote 15]

By like token, the developer here, absent an express condition in the instrument of transfer sufficient to create an enforceable right against the County, retained no power to reclaim the land should the County fail of its purpose. And absent such conditions on the County's estate in the land, the County took in fee simple, as the Virginia statute specifies, and was free as a matter of property law to do with the property what it wished. [Footnote 17]

48 F.3d at 527 (footnote 16 omitted).

This passage clearly indicates that we determined that any understanding that the County may originally have had with the developer regarding the use of the 16.05 acres did not restrict the potential uses of the property for the purpose of determining its fair market value at the time of the taking. Furthermore, even if there had been an enforceable understanding between the County and the developer that the 16.05 acres was originally planned for use as a road, there is sufficient evidence in the record to support the Court of Federal Claims' finding that street locations in similar types of developments are commonly changed during construction of the development, as discussed previously.

### CONCLUSION

For the foregoing reasons, the final judgment of the Court of Federal Claims that awarded compensation to the Board of County Supervisors of Prince William County, Virginia, in the total amount of $1,153,578.00 for the taking of the 16.05 acres at issue is

### AFFIRMED.

No costs.