# United States Court of Appeals for the Federal Circuit

---

**GADSDEN INDUSTRIAL PARK, LLC,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES,**

*Defendant-Cross-Appellant*

---

2018-2132, 2018-2147

---

Appeals from the United States Court of Federal Claims in No. 1:10-cv-00757-EGB, Senior Judge Eric G. Bruggink.

---

Decided: April 22, 2020

---

EDWARD LEVICOFF, The Levicoff Law Firm, PC, Pittsburgh, PA, argued for plaintiff-appellant.

KENNETH DINTZER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-cross-appellant. Also represented by ERIC JOHN SINGLEY, JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

---

Before WALLACH, TARANTO, and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge*.

This appeal and cross-appeal concern an alleged taking by the U.S. Environmental Protection Agency (EPA) from Gadsden Industrial Park (GIP) of certain steelmaking material located on a parcel of real property in Gadsden, Alabama. GIP appeals the trial court's just compensation awards, arguing that they should be increased. The Government appeals the trial court's conclusion that GIP had a cognizable property interest in certain material the EPA recovered from the parcel. For the reasons set forth below, we affirm-in-part, reverse-in-part, and vacate-in-part.

## BACKGROUND

This case involves GIP's takings claim for "slag," "kish," and "scrap." The parties do not dispute the trial court's definitions of these terms. Slag, a byproduct of steel manufacturing, is "a non-ferrous material that separates during smelting." *Gadsden Indus. Park, LLC v. United States*, 138 Fed. Cl. 79, 92 (2018) (*Decision*). Kish is "a ferrous byproduct of a blast furnace operation in various sizes that has economic value." *Id.* at 94. Scrap refers to "metal of various sizes that may or may not be ferrous, but that can be either recycled into steel manufacturing or sold for other purposes. It is typically finished steel product . . . and is thus not a byproduct." *Id.* at 92.

I

In 2002, GIP purchased certain real and personal property at an auction of a steel mill's bankruptcy estate, as reflected in the bankruptcy trustee's Bill of Sale. GIP specifically omitted some real property from the purchase, including a parcel known as the "Eastern Excluded Property." GIP did, however, purchase certain personal property located on the Eastern Excluded Property. Alabama law governs the contract covering GIP's asset purchase.

Relevant to this appeal, the Eastern Excluded Property contains two large piles of material, comprising, among other things, large quantities of slag, kish, and scrap. At the time of GIP's purchase, each pile occupied more than ten acres of land, contained an estimated three to four million cubic yards of material, and was more than eighty feet high. J.A. 3091 ¶ 4. Each pile was a state-licensed industrial landfill. Transcript of Proceedings at 209:10–210:13, *Gadsden Indus. Park, LLC v. United States*, No. 10-757 (Fed. Cl. June 26, 2017), ECF No. 169;[1] J.A. 3091 ¶¶ 2–4, 3106.

The bankruptcy trustee identified the assets for sale in the auction as "[a]ll materials, whether raw materials or by-products, situated within the boundaries of the real property being sold, including kish and scrap."[2] J.A. 2586. The identified assets included "inventory," which itself included "by[-]products of manufacturing including but not limited to kish and miscellaneous other materials and assorted scrap." J.A. 2612. Prior to making its purchase, GIP drafted a "Purchaser's Itemization of Excluded Items

---

[1] The Court of Federal Claims held a seven-day trial in two waves, first from June 26–29, 2017 and then from July 26–28, 2017. The transcript of the trial proceedings is consecutively paginated across seven volumes, with each day corresponding to a separate volume. Transcript of Proceedings, *Gadsden Indus. Park, LLC v. United States*, No. 10-757 (Fed. Cl. June 26–29, 2017 & July 26–28, 2017), ECF Nos. 169, 171, 173, 175, 178, 180, 182. We hereinafter refer to trial testimony by citing the transcript page or pages where it appears using "Trial Tr."

[2] "[T]he real property being sold" refers to all of the real property of the steel mill's bankruptcy estate offered for sale to the highest bidder in the bankruptcy auction. *See* J.A. 2581, 2586, 3092 ¶¶ 5–9, 3173 ¶¶ 5–6, 3180–89 ¶¶ 1,10, 13, 20, 26, 31, 32A.

from Sale." J.A. 2639.  Relevant here, GIP excluded certain items from "inventory":

> 1. With reference to the property identified in "ATTACHMENT 5 – INVENTORY," Purchaser excludes:
>
> A. All miscellaneous other materials.
>
> B. *All by-products of production other than kish and 420,000 cubic yards of slag* which are located on the Excluded Real Property as is described on Exhibit B to the deed from Seller to Purchaser of even date herewith, together with a reasonable period of time to remove such items.

*Id.* (emphasis added).

In 2003, the EPA began investigating claims of contaminants leaching from the piles on the Eastern Excluded Property.  Over the course of several years, the EPA determined that contaminants from the piles were migrating from the Eastern Excluded Property and began communicating with GIP regarding ownership and environmental remediation issues.  At the same time, GIP began discussing with Watkins Metal Co. the separation of recoverable metals from the Eastern Excluded Property. GIP and Watkins drafted, but did not consummate, an "Agreement to Process Kish," which provided that for $70 per ton of output, Watkins would "separate and screen the Kish in order for [GIP] to reclaim and sell the metals in the Kish."   J.A. 2861  ¶¶  3,  5.   Under  the  non-finalized agreement, Watkins would have had an exclusive right to separate recoverable metals from the piles so long as Watkins reclaimed 500 tons of metal per month, in addition to the right to withdraw from the agreement should recovery become unprofitable.  J.A. 2862 ¶ 12.

In October 2008, the EPA decided to remediate the environmental problems on the Eastern Excluded Property by having contractors reduce the size of the piles through

recovery and sale of saleable material from the piles. Once the contractors had extracted saleable material, the EPA planned to cap what was left of the piles.[3]  From October 2009 to February 2013, contractors recovered material from the piles, selling 245,890 tons of material for about $13.5 million. J.A. 3093–94 ¶¶ 15–16. The EPA and its contractors also recovered and used 92,500 cubic yards of slag onsite for environmental remediation. Trial Tr. 1367:5–8.

Mr. Casey, the owner of GIP, testified at trial that prior to the start of the EPA's recovery operation, GIP had removed about 15,000 cubic yards of its allotment of slag, using some, selling some, and giving some away. Trial Tr. 206:17–207:9. As of March 2008, GIP had not removed any kish from the Eastern Excluded Property.

In 2013, the project became unprofitable, and the EPA shut it down. At that point, the EPA contractors had processed approximately 50% of the material in the piles. Ultimately, the EPA contractors spent $14.5 million on the recovery operation, about a million more than income from sales. Trial Tr. 1242:18–1243:6. The EPA never capped the piles. Instead, the EPA "compacted the materials to minimize leachate," leaving further remediation to state environmental authorities. J.A. 3086. GIP did not attempt its own recovery operation during the EPA's remediation project.

## II

GIP sued the Government in the United States Court of Federal Claims, alleging a Fifth Amendment takings

---

[3] Capping each pile would involve regrading it to allow placement of a clay cap over the entire pile to stop hazardous leachate from seeping from the pile. *See* Trial Tr. 640:25–642:25.

claim for the slag, kish, and scrap[4] recovered from the Eastern Excluded Property by the EPA. At trial, GIP sought damages of $755,494 for 92,500 cubic yards of slag. Applying a fair market value theory, Mr. Gleason, GIP's damages expert, calculated just compensation for the kish and scrap taken by the EPA at around either $9.8 million or $10.4 million, depending on the geographic market used in the calculation.[5] Trial Tr. 1277:10–18.

Mr. Gleason valued the kish and scrap taken by estimating their net present value as of June 4, 2008, the date GIP alleges the takings occurred.[6] *See* Trial Tr. 1225:19–1226:7, 1260:24–1261:20. Two elements of Mr. Gleason's damages calculation are relevant here:

---

[4] The Government contends that GIP "did not allege a taking of 'scrap'—as distinct from the alleged takings of 'kish' and slag'—until it filed its post-trial brief." Appellee's Br. 61–62. The Court of Federal Claims considered the Government's position and concluded that GIP's takings claim for scrap was tried by consent. While we see no error in the trial court's conclusion, we need not reach this issue because we affirm the trial court's award of no damages as discussed below.

[5] Mr. Gleason also offered a lost profits damages theory, which the trial court rejected as "not the appropriate measure of just compensation." *Decision*, 138 Fed. Cl. at 97 (citing *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379 (1945)). Addressing the merits, the trial court found that "Mr. Gleason's lost profit calculation suffers from many of the same defects discussed" with respect to his fair market value calculation "due to the unreliable calculation of avoided costs." *Id.* at 97 n.5. Our discussion of avoided costs applies equally to both of Mr. Gleason's damages theories.

[6] The Government did not offer a competing date of taking at trial.

revenue and costs. To calculate revenue, Mr. Gleason approximated a June 2008 price for the kish and scrap and applied that price to the actual volume of material recovered by the EPA contractors. Trial Tr. 1262:7–1263:10. Mr. Gleason also estimated GIP's avoided costs—the costs GIP hypothetically would have incurred by partnering with Watkins to conduct its own recovery operation. *See* Trial Tr. 1230:4–14, 1242:12–17, 1330:7–1331:17. To get a net present value of the kish and scrap as of June 4, 2008, Mr. Gleason subtracted avoided costs from revenue and applied a discount rate to that number. *See* Trial Tr. 1259:18–1262:15, 1276:4–1277:14.

To approximate the June 2008 price, Mr. Gleason used an industry publication to relate the contractors' sales price to the market price of a comparison metal over the course of the EPA's remediation project. *See* Trial Tr. 1267:3–1268:11, 1270:11–1271:15. Mr. Gleason then applied that relationship to the average market price of the comparison metal from April 2008 to June 2008, which yielded a price of $483 per ton. *Id.*; Trial Tr. 1262:20–1263:12. At trial, Mr. Gleason conceded that his approximated June 2008 price was "historically . . . a very high price" that lasted only "[f]ive or six months" before taking a dive. Trial Tr. 1262:20–1264:6, 1265:19–1266:3. Overall, Mr. Gleason projected the revenue from a June 2008 sale of kish and scrap to be $19,873,418, significantly more than the EPA contractors' $13.5 million in revenue. Trial Tr. 1273:17–21; J.A. 3094 ¶ 16.

To determine GIP's avoided costs, Mr. Gleason assumed that GIP would have consummated its agreement with Watkins to process kish for $70 per ton. Trial Tr. 1239:24–1240:23. He further relied on a purported oral modification to the agreement under which GIP would not pay Watkins anything for recovered material that GIP sold for less than $70 per ton. Trial Tr. 1247:14–1248:18. Because GIP already employed sales and administrative personnel, Mr. Gleason assumed that GIP would incur no

additional administrative, sales, or overhead costs as a result of partnering with Watkins. Trial Tr. 1257:12–1258:3.  He also assumed that the sales price of the recovered materials would include freight.  Trial Tr. 1256:22–1257:3.  Mr. Gleason concluded that GIP's avoided costs were about $4.9 million.  Trial Tr. 1258:4–6.

The Government argued that Mr. Gleason's fair market valuation suffered from at least two flaws.  First, the Government asserted that Mr. Gleason's use of the historically high June 2008 sales price for all material was improper because the material was sold over a longer period of time, during which a purchaser would have expected the price to fall.  Second, the Government maintained that Mr. Gleason's reliance on the Watkins agreement to calculate avoided costs was unfounded due to critical distinctions between Watkins and the EPA contractors.  For example, the evidence did not suggest that Watkins had a similar processing capacity as the EPA contractors, and Watkins had the right to walk away from the project if it became unprofitable.

Following a seven-day trial, the Court of Federal Claims concluded that "GIP purchased kish, assorted scrap, and 420,000 cubic yards of slag at the bankruptcy auction," that "each material was present on the Eastern Excluded Property[,] and that it was used or sold by EPA." *Decision*, 138 Fed. Cl. at 90.  Additionally, the trial court held that the EPA's remediation project effected a compensable taking of GIP's slag, scrap, and kish.  *Id.*  Accordingly, the trial court awarded GIP $755,494 for the EPA's taking of 92,500 cubic yards of slag.  *Id.* at 100.

Regarding the scrap and kish, however, the Court of Federal Claims found that GIP had failed to provide "sufficient reliable proof of what a willing buyer would have paid for the scrap and kish." *Id.*  First, the trial court agreed with the Government that Mr. Gleason's "construction of an artificial sales price as of June 2008 for

materials sold later was inappropriate," because a buyer would know that it would not instantly recover the value of the materials sold and "would be presumed to know that the price in June 2008 was abnormally high." *Id.* at 99. Second, the trial court deemed Mr. Gleason's avoided costs calculations flawed at least because they assumed that all of the risk in GIP's hypothetical recovery project "would have been borne by Watkins, which, in actuality, maintained the right to walk away from the recovery operation by the terms of the draft agreement." *Id.* The trial court further criticized GIP's avoided costs calculation, characterizing assumptions drawn from the EPA contractors' records as "highly questionable," due to differences in the EPA contractors' processing capacity and the capacity required of Watkins to maintain exclusivity. *Id.* at 99–100. The trial court also concluded that GIP would have experienced other costs unaccounted for by Mr. Gleason. *Id.* Unable to calculate just compensation with reasonable certainty, the trial court awarded GIP zero damages for the EPA's taking of GIP's kish and scrap. *See id.* at 100.

The Government and GIP appeal. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

### DISCUSSION

The Government asserts that the Court of Federal Claims erred in concluding that the EPA took GIP's slag. For its part, GIP contends that the trial court should have awarded just compensation for 405,000 cubic yards of slag rather than only 92,500 cubic yards of slag. GIP further argues that the trial court erred by awarding GIP no just compensation for its kish and scrap after concluding that the kish and scrap had value and that the EPA had taken them. We address these arguments in turn, first considering the parties' arguments with respect to slag, and then turning to their arguments regarding kish and scrap.

We review the Court of Federal Claims' legal conclusions de novo and its fact findings for clear error. *Holland v. United States*, 621 F.3d 1366, 1374 (Fed. Cir. 2010) (citing *Cal. Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1346 (Fed. Cir. 2001)). A fact finding is "clearly erroneous" when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Am. Pelagic Fishing Co. v. United States*, 379 F.3d 1363, 1371 (Fed. Cir. 2004) (quoting *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1379 (Fed. Cir. 2001)).

I

The Government asserts that the trial court erred in holding that GIP had proven the requisite property interest to establish a takings claim for slag. "Whether a taking under the Fifth Amendment has occurred is a question of law with factual underpinnings." *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009) (citing *Alves v. United States*, 133 F.3d 1454, 1456 (Fed. Cir. 1998)). The plaintiff in a takings case bears the burden to demonstrate a protectable property interest. *See Palmyra Pac. Seafoods, L.L.C. v. United States*, 561 F.3d 1361, 1364–65 (Fed. Cir. 2009).

According to the Government, the Court of Federal Claims erred when it concluded "that the Government took [GIP's] slag—as differentiated from the tons of slag that remain on th[e] property." Cross-Appellant's Br. 32. GIP does not dispute that following completion of the EPA's remediation project, slag remains on the Eastern Excluded Property. Instead, GIP responds that the presence of slag is "irrelevant to whether a taking occurred," because the EPA "embalm[ed] permanently" all remaining materials at the conclusion of its remediation project, thereby preventing GIP from recovering its full allotment of slag. Appellant's Resp. Br. 32, 35 (quoting *Decision*, 138 Fed. Cl. at 96). Accordingly, GIP seeks increased just

compensation to account for 405,000 cubic yards of slag—the amount remaining in GIP's allotment when the EPA's remediation project began.    We agree with the Government.

GIP has not demonstrated that the EPA's presence and operations on the Eastern Excluded Property intruded on any of GIP's property rights to slag.   GIP specifically excluded from its purchase "[a]ll by-products of production other than kish and 420,000 cubic yards of slag." J.A. 2639. As a matter of law, the Exclusion List that GIP itself drafted conveyed title to GIP in 420,000 undifferentiated cubic yards of slag on the Eastern Excluded Property.  *See Wheeler v. First Ala. Bank of Birmingham*, 364 So. 2d 1190, 1194 (Ala. 1978) ("The construction of a written document is a function of the court.  If the document is unambiguous, its construction and legal effect is a question of law." (citations omitted)).   As GIP concedes, slag is fungible, and the Bill of Sale included no limitations that would restrict GIP's 420,000 cubic yards of slag to any particular subset of the whole of the slag on the Eastern Excluded Property.  Appellant's Resp. Br. 24.  Nothing in the Bill of Sale granted GIP first rights to mine slag from the piles, the right to exclude others from the Eastern Excluded Property, or any other property right that the EPA could take by merely temporarily excluding GIP from the Eastern Excluded Property.  Indeed, GIP repudiates any notion that the Bill of Sale granted it the right to mine the piles, *id.* at 1–3, and GIP specifically excluded the Eastern Excluded Property parcel from its purchase of real property, J.A. 3092 ¶ 8.  GIP was entitled to no more than 420,000 cubic yards of slag, and the evidence overwhelmingly indicates that even after the EPA's remediation project, sufficient slag remained on the Eastern Excluded Property for GIP to recover its full allotment.    *See* Trial Tr. 545:3–24, 1365:12–1366:1; J.A. 3091 ¶ 4.

GIP argues that the EPA prevented it from recovering its full allotment of slag because, as the trial court found, the EPA "embalm[ed] permanently" all material remaining in the Eastern Excluded Property piles after concluding its recovery operation.  Appellant's Resp. Br. 35 (quoting *Decision*, 138 Fed. Cl. at 96).  On this record, however, the trial court's finding is clearly erroneous.

The Court of Federal Claims did not cite any evidence to support its finding that the remaining material was "embalm[ed] permanently."  *Id.*  Indeed, the trial court elsewhere noted that the EPA had not capped[7] the piles after concluding its recovery operation.  *Id.* at 90.  Nor did GIP cite any evidence to support the trial court's finding that materials were "embalm[ed] permanently."  During oral argument, counsel for GIP pointed to Mr. Casey's testimony that when the EPA contractors left the site, the slag on the Eastern Excluded Property was "mixed with trash and therefore is unusable."  Oral Arg. at 5:03–37, 30:44–31:01 (citing J.A. 265–66).  In the same discussion, however, Mr. Casey admitted that at the time of purchase, the piles were "industrial landfills" into which the bankrupt steel mill had deposited "about ten different types of trash."  Trial Tr. 209:20–210:13.  He further testified that during the EPA's recovery operation, the EPA "took the slag and put it over with the trash that they weren't using from the north and south pile."  *Id.*  Therefore, the trial court's finding that the slag was unusable after the EPA's remediation project is belied by the record.

---

[7] During oral argument, counsel for GIP acknowledged that the EPA never capped the piles.  Oral Arg. at 6:50–7:18, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-2132.mp3.  Counsel interpreted the trial court's use of the phrase "embalm[ed]" to mean that the material was "unusable."  *Id.*

GIP's argument that the finding was supported by the trial judge's firsthand observations during a site visit is easily disposed of.  Appellant's Resp. Br. 7, 35.  The trial court's opinion does not mention any site visit, let alone rely on a site visit to support its finding that materials were "embalm[ed] permanently."  The only discussions of a site visit during trial do not mention "embalmed" material and instead support the notion that recoverable material remains on the Eastern Excluded Property.  *See, e.g.*, Trial Tr. 1092:24–1093:4 (trial judge noting "[t]he piles have been gone through since [the EPA contractors] left, and yet what's left seems to be a lot of ferrous kind of material that's magnetic"); Trial Tr. 1170:24–1173:15 (noting site visit observation of leachate on the south Eastern Excluded Property pile, and trial judge's observation that the EPA's leftover material on a third pile was still adhering to a magnet).

Additional witness testimony further supports the notion that after the conclusion of the EPA's remediation project, the Eastern Excluded Property piles contained recoverable material.  For example, Mr. Brady, who worked on the Eastern Excluded Property piles as a site manager for an EPA contractor, testified that he was sure that metal and a significant amount of slag remain in the piles following the conclusion of the EPA's remediation project, and that he did not know of anything that would prevent a party "willing to make the investment" from "mining the rest of the material" in the piles.  Trial Tr. 1008:9–22.  And a project manager for an EPA contractor who worked on the Eastern Excluded Property when the EPA began winding down its recovery operation testified that at the end of the project, the EPA "just ensur[ed] that the piles were rounded and that runoff would go into the ditch."  Trial Tr. 894:1–12.  We find no record support for the trial court's finding that material was "embalm[ed] permanently" at the conclusion of the EPA's project.

Because GIP has no claim to any particular subset of slag on the Eastern Excluded Property and the trial court erred in finding that the EPA somehow prevented GIP from recovering its full allotment of slag, GIP cannot establish a cognizable property interest in the slag that the EPA recovered. Accordingly, we vacate the trial court's award of damages for 92,500 cubic yards of slag.

## II

Regarding kish and scrap, GIP argues that the trial court "was duty-bound to fashion an appropriate damage award," and "had no discretion to award zero damages as just compensation" after it found that the kish and scrap the EPA recovered had value.[8] Appellant's Br. 38–40. But "[o]nce a taking has been established, it is the [property ]owner who bears the burden of proving an actual loss has occurred." *Otay Mesa Prop., L.P. v. United States*, 779 F.3d 1315, 1323 (Fed. Cir. 2015) (citing *Bd. of Cnty. Supervisors of Prince William Cnty. v. United States*, 276 F.3d 1359, 1364 (Fed. Cir. 2002)). "To carry its burden, the [property ]owner must show actual damages 'with reasonable certain[t]y,' which 'requires more than a guess, but less than absolute exactness.'" *Id.* (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010)). We hold that the trial court in a takings case is not obligated to fashion its own award when a plaintiff has not provided evidence sufficient to determine just compensation with reasonable certainty.

We find no takings cases—nor does GIP cite any—supporting the notion that the trial court must fashion its

---

[8] We agree with the trial court that GIP had a cognizable property interest in all of the kish and scrap on the Eastern Excluded Property. The Bill of Sale did not limit the amounts of kish and scrap that GIP purchased. J.A. 2586, 2612, 2639.

own award in the absence of evidence sufficient to determine an appropriate measure of just compensation with reasonable certainty.  The cases identified by GIP merely stand for the proposition that the trial court has the discretion to make its own findings on damages rather than adopting in full either party's damages theory.

GIP relies on *Whitney Benefits,* which cites *Almota Farmers* for the proposition that "[w]hen private property is taken for a public purpose, the Constitution requires the taker to pay the owner 'just compensation' and *imposes on the court the duty of determining what compensation is just.*"  *Whitney Benefits, Inc. v. United States,* 18 Cl. Ct. 394, 407 (1989) (emphasis added) (citing *Almota Farmers Elevator & Warehouse Co. v. United States,* 409 U.S. 470 (1973)); *see also* Appellant's Br. 25.  As an initial matter, we note that as a decision from the Claims Court, *Whitney Benefits* is not binding authority on this court.  *See K-Con, Inc. v. Sec'y of Army,* 908 F.3d 719, 726 (Fed. Cir. 2018).  Additionally, *Whitney Benefits* did not address a situation where the plaintiff had failed to prove just compensation with reasonable certainty.  Rather, the trial court in *Whitney Benefits* largely adopted the plaintiffs' just compensation calculation, making modifications as it deemed appropriate based on extensive evidence from both parties regarding valuation of the subject property.  18 Cl. Ct. at 407–16. Similarly, *Almota Farmers* does not obligate a trial court to calculate just compensation.  Rather, *Almota Farmers* merely holds that, for just compensation purposes, improvements to leasehold property should be assessed at their fair market value in place on the leasehold property over their useful life, without regard to the remaining term of the lease.  409 U.S. at 473.  Nothing in *Almota Farmers* suggests that the plaintiff did not present sufficient evidence to allow the trial court to determine just compensation with reasonable certainty.

GIP's reliance on *Otay Mesa* for the same proposition is similarly unavailing.  In *Otay Mesa*, we affirmed the Court

of Federal Claims' independent formulation of a just compensation award when it "was confronted with conflicting evidence and relatively extreme valuations" from the plaintiff and the Government.  779 F.3d at 1326.  "We detect[ed] nothing inappropriate with the Court of Federal Claims looking at the evidence as a whole and using its own methodology to calculate a damages award." *Id.*  We further noted "that it is both correct and important for a trial court to use its flexibility to tailor a fair and reasonable result *based on the evidence it credits or rejects*." *Id.* (emphasis added) (citing *Precision Pine*, 596 F.3d at 832–33).  GIP correctly notes that, in endorsing the trial court's use of its own methodology to determine just compensation, we stated: "the [trial] court had few options in determining a just compensation award other than creating its own valuation." *Id.*  But we did not hold that the trial court *must* fashion its own award; rather, we held that it *may* do so.  Moreover, the *Otay Mesa* trial court had sufficient record evidence to fashion an award that was "within the range of credible testimony" and "reasonable on the evidence." *Id.* at 1327.  Contrary to GIP's suggestion, *Otay Mesa* did not hold that a trial court must fashion its own just compensation award when not presented with sufficient evidence to do so with reasonable certainty.

Consistent with these principles, the Court of Federal Claims in this case acknowledged that it "may award damages, even if [it] does not fully credit [a] party's methodology." *Decision*, 138 Fed. Cl. at 100 (quoting *Precision Pine*, 596 F.3d at 833).  It found, however, that it was "not given sufficient reliable proof of what a willing buyer would have paid for the scrap and kish" to independently determine a damages award. *Id.*  On this record, the trial court did not err.

The trial court found Mr. Gleason's calculations unreliable due to his reliance on what it deemed ill-founded assumptions to calculate avoided costs and his use of an inflated June 2008 sales price to calculate revenues for

material sold later. We cannot say that the Court of Federal Claims erred in these findings. On this record, a reasonable fact finder may well have been able to approximate the revenues from sales of kish and scrap using a more accurate methodology not presented by Mr. Gleason. But there is little in the record to allow any calculation with reasonable certainty of GIP's avoided costs, a critical component of the just compensation calculation under both a fair market value theory and a lost profits theory.

The only evidence GIP offered to prove just compensation was Mr. Gleason's testimony regarding his calculations based on the non-finalized Watkins agreement. The record also contained evidence of the EPA contractors' recovery costs. It was not unreasonable for the trial court to conclude that neither provided sufficient evidence to calculate just compensation with reasonable certainty.

The trial court reasonably found that certain assumptions underlying Mr. Gleason's avoided costs calculations rendered them unreliable. By crediting the oral addendum to the Watkins agreement, Mr. Gleason assumed Watkins would willingly provide GIP with free labor to recover any material from the piles which GIP could not sell for a profit. The trial court did not err in finding this assumption unreasonable. Mr. Gleason also assumed that Watkins would process the same amount of material at the same capacity as the EPA contractors regardless of market prices. Mr. Gleason thus essentially discarded the provision allowing Watkins to walk away if the agreement became unprofitable, thereby shifting all the risk of a drop in prices to Watkins while assuming Watkins would complete the contract. Trial Tr. 1247:14–1248:18, 1330:7–18. The trial court did not err in finding this second assumption unreasonable.

18          GADSDEN INDUSTRIAL PARK, LLC v. UNITED STATES

Further undermining Mr. Gleason's avoided costs calculations, the evidence does not support the notion that Watkins had the same capacity to process material as the EPA contractors. Watkins thought it would take at least ten years to process the piles, while the EPA contractors processed half the piles in approximately four years. Trial Tr. 384:8–13, 545:3–18; J.A. 3094 ¶ 16. And if Watkins processed the minimum tonnage required under the Watkins agreement, it would take Watkins around forty years to process the same amount of material that the EPA contractors processed in approximately four years. Trial Tr. 1312:1–14. Mr. Gleason acknowledged that if it took Watkins longer to process the piles, there would be a longer period of discounting for his fair market valuation, resulting in reduced value for the same volume of material. *See* Trial Tr. 1353:8–1354:17. Nonetheless, Mr. Gleason assumed that Watkins would follow the same material processing schedule as the EPA contractors, at around a third of their costs. Trial Tr. 1247:14–1248:18, 1258:4–6, 1330:7–18. The trial court did not err in finding this assumption unreasonable.

Mr. Gleason also did not account for additional costs GIP would have incurred had it run its own recovery project, such as those associated with supervising the Watkins operation and loading, marketing, and selling recovered material. Trial Tr. 1257:12–1258:3, 1349:19–1350:16. The trial court did not err in noting this deficiency.

With respect to evidence of the EPA contractors' costs, even GIP concedes that they are not an appropriate proxy to assess GIP's avoided costs. Mr. Gleason testified that the EPA and GIP ran "two totally different operations" on the Eastern Excluded Property with "different activities, different goals, [and] objectives," and "that account for different costs." Trial Tr. 1299:20–1300:9. It was therefore reasonable for the trial court to conclude that neither the

Watkins agreement nor the EPA contractors' costs provided competent evidence of GIP's avoided costs.

As the Court of Federal Claims recognized, Mr. Gleason's calculations arbitrarily lowered GIP's avoided costs at every turn. At a minimum, Mr. Gleason's unreliable calculations left open too many variables for the trial court to resolve on its own with reasonable certainty based on the evidence available. Left without competent evidence relating to a critical component of the damages calculation, the trial court did not err in determining that that it could not independently fashion a just compensation award. We therefore affirm the trial court's award of zero damages for the Government's taking of kish and scrap.

## CONCLUSION

We have considered the parties' remaining arguments and do not find them persuasive. For the foregoing reasons, we reverse the Court of Federal Claims' decision that GIP had a cognizable property interest in the slag recovered by the EPA, vacate the trial court's award of just compensation for 92,500 cubic yards of slag, and affirm the trial court's award of zero just compensation for kish and scrap.

**AFFIRMED-IN-PART, REVERSED-IN-PART, AND VACATED-IN-PART**

COSTS

No costs.