# United States Court of Appeals for the Federal Circuit

---

**CITY OF WILMINGTON, DELAWARE,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2022-1581

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-01691-MHS, Judge Matthew H. Solomson.

---

Decided: May 31, 2023

---

PAUL THOMAS NYFFELER, Hunton Andrews Kurth, Richmond, VA, argued for plaintiff-appellant.

P. DAVIS OLIVER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, FRANKLIN E. WHITE, JR.

AMANDA WATERS, McGuireWoods LLP, McLean, VA, for amicus curiae National Association of Clean Water Agencies.

---

Before PROST, WALLACH, and CHEN, *Circuit Judges.*

PROST, *Circuit Judge.*

This case arises under the Clean Water Act ("CWA") and concerns the requirement that federal entities comply with local efforts to abate water pollution. The city of Wilmington, Delaware ("Wilmington"), appeals a decision by the U.S. Court of Federal Claims holding that certain fees Wilmington assessed against the United States for stormwater management are not reasonable service charges under 33 U.S.C. § 1323. Wilmington appeals. We affirm.

## BACKGROUND

As part of its efforts to manage local water pollution, Wilmington charges its residential and non-residential property owners a stormwater management fee. The U.S. Army Corps of Engineers ("USACE"), which owns five properties in Wilmington, disputes whether the CWA, 33 U.S.C. § 1323, waives the USACE's sovereign immunity with respect to this fee.

## I

The Court of Federal Claims provides a thorough recitation of the statutory history of the CWA. *City of Wilmington v. United States*, 157 Fed. Cl. 705, 710–11 (2022) ("*Decision*"). Briefly, in 1948, Congress passed the predecessor to the CWA, the Federal Water Pollution Control Act ("FWPCA"), to reduce water pollution. Pub. L. No. 80-845, 62 Stat. 1155 (1948). After a series of other amendments, Congress in 1972 revised the FWCPA (the "1972 amendments") and enacted the modern version of the CWA. Federal Water Pollution Control Act Amendments of 1972, Pub. L. No. 92-500, 86 Stat. 816. The 1972 amendments attempted to limit pollutants in state waters and required states to establish "total maximum daily loads" ("TMDLs") setting forth the maximum amount of a pollutant

permitted to enter waterbodies the state had identified as impaired.  86 Stat. at 848.

As part of the 1972 amendments, Congress first enacted the provision of the CWA at issue: 33 U.S.C. § 1323 (the "Federal Facilities Section").  The Federal Facilities Section requires federal facilities to comply with federal, state, interstate, and local requirements related to the abatement of water pollution.[1]

Section 1323 currently provides in relevant part:

(a) Compliance with pollution control requirements by Federal entities

Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, . . . shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity *including the payment of reasonable service charges*.  The preceding sentence shall apply (A) to any requirement whether substantive or procedural . . ., (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction. . . .  This subsection shall

---

[1]    Congress expanded the Federal Facilities Section in 1977 to clarify that federal facilities must also comply with local permitting requirements.  Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1566.  The 1977 amendment in large part solidified the current language of § 1323.

apply notwithstanding any immunity of such agencies . . . under any law or rule of law.

33 U.S.C. § 1323(a) (emphasis added).

In 2011, Congress amended the CWA (the "2011 amendments") to define the term "reasonable service charges" as used in subsection 1323(a), as follows:

For the purposes of this chapter, reasonable service charges described in subsection (a) include any reasonable nondiscriminatory fee, charge, or assessment that is—

(A) based on *some fair approximation of the proportionate contribution of the property or facility to stormwater pollution* (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility); and

(B) used to pay or reimburse the costs associated with any stormwater management program . . . .

*Id.* § 1323(c) (emphasis added); *see also* Federal Responsibility to Pay for Stormwater Programs Act of 2011, Pub. L. No. 111-378, 124 Stat. 4128.

## II

Wilmington must comply with federal water pollution requirements and the TMDLs established for the Christina River Basin and other local waters. J.A. 993–94. As a source of pollution, stormwater discharge is subject to TMDLs. In January 2007, Wilmington implemented a stormwater management program "to enhance surface water quality by reducing the quantity and rate of stormwater runoff and the amount of pollutants discharged into the rivers." J.A. 220. In support of this program, Wilmington charges all owners of property within its corporate boundaries—both residential and non-residential—a monthly stormwater management fee based on an estimation of

each property's contribution to stormwater runoff.[2] WILMINGTON, DE CODE § 45-53 ("Wilmington Code").

Because no city can precisely measure the actual amount of stormwater pollution from each property, the city devised a methodology for approximating the runoff attributable to each property based on recommendations from the engineering firm Black & Veatch. For non-residential properties, the city assesses each parcel's monthly stormwater fee based on a formula comprised of four variables.[3]

The first variable in the city's formula is the total area of the property ("gross parcel area"), as measured by the New Castle County ("County") Department of Land Use tax assessment records. Wilmington Code § 45-53(a). The second variable is a "runoff coefficient," which is a multiplier based on estimates of a property's imperviousness. Wilmington determined that imperviousness is a useful method for approximating a property's contribution to runoff because more rain runs off highly impervious properties, such as buildings or paved surfaces, than less impervious areas like a marsh or open field. *See* J.A. 134 at 129:1–8; J.A. 175 at 293:6–8. Accordingly, the runoff

---

[2]    Wilmington previously charged property owners on a quarterly basis before adopting a monthly billing cycle. *See Decision*, 157 Fed. Cl. at 715 n.8.

[3]    Due to the greater availability and precision of data for residential properties, the city uses the actual square footage of the main, attached, and detached structures from County records and calculates "the impervious area as the sum of the square footage" of those structures. J.A. 228; *see also* J.A. 132 at 122:2–23. The city's methodology for calculating stormwater fees for residential properties is not at issue.

coefficient ranges from 0 to 1, with a higher coefficient indicating greater imperviousness. *See* J.A. 227.

To determine a property's runoff coefficient, Wilmington starts with County tax records. The tax records assign each parcel a land use code based on the occupancy permit issued to the parcel (referred to as either a "land use code" or "occupancy code"). J.A. 464. The County "has defined over 200 land use [codes] to designate the specific type of land use for a parcel," to include, for example, "hotels," "single-family," or "vacant" properties. J.A. 226. Wilmington uses these land use codes to assign each property to one of 11 "stormwater classes." J.A. 227; *see* J.A. 238–43 (tabulating each code and its associated stormwater class).

Once the various properties were categorized into a particular stormwater class, each stormwater class needed a runoff coefficient such that every property in each class would be assigned the same coefficient. The engineering firm Black & Veatch developed Wilmington's runoff coefficients using a 1962 study authored by Dr. Ven Te Chow (the "1962 Study"), which specified a range of potential runoff coefficients for various "types of land use" described by a few words, e.g., "Parks, Cemeteries," "Playgrounds," "Railroad Yard Areas," and "Unimproved Areas." J.A. 228 (Table 2). These types of land use were then roughly matched with Wilmington's stormwater classes, and the higher end of the runoff coefficient range for each type of land use from the 1962 Study was assigned to each stormwater class. J.A. 82 at 322:3–7. For instance, it appears that the stormwater class "Parks & Cemeteries" was matched with the type of land use "Parks, Cemeteries" having a runoff coefficient range of 0.10–0.25. Thus, the stormwater class "Parks & Cemeteries" was assigned a runoff coefficient of 0.25. J.A. 229 (Table 3). Similarly, the stormwater class "Recreational Playgrounds / Arenas" was apparently matched with "Playgrounds" and assigned a coefficient of 0.35. *Id.* Relevant here, the stormwater class "Vacant Land" was apparently matched with "Unimproved

Areas" from the 1962 Study and assigned a runoff coefficient of 0.30.  *Id.*

The third variable—impervious area—is calculated by multiplying the property's total area by the property's assigned runoff coefficient. Wilmington Code § 45-53(a). The impervious area variable attempts to measure "the total square feet of hard surface areas" on the property.  *Id.*; *see also* J.A. 227 (impervious area measures how impervious a property is to the permeability of rainfall).  Fourth, Wilmington standardizes properties (i.e., provides a "common denominator") by using an "equivalency stormwater unit" ("ESU") of 789 square feet, derived from the size of the median single-family home in Wilmington.  Wilmington Code § 45-53(a).  Wilmington normalizes the impervious area of properties by dividing the impervious area by the ESU.  *Id.* § 45-53(d)(8); J.A. 229.  This calculation results in the number of ESUs, or the "ESU factor," for the property.  Wilmington Code § 45-53(a).

Wilmington then calculates the monthly charge to a property owner by multiplying the ESU factor by the city's charge rate to yield the total monthly charge for the property.  *Id.; see also id.* § 45-53(d), (d)(9).

For Wilmington property owners who dispute the city's stormwater charges, the city provides an administrative appeal process that permits property owners to appeal: "(1) the calculation of the storm water charge; (2) the assigned storm water class; (3) the assigned tier, if applicable; and (4) the eligibility for a credit."  *Id.* § 45-53(d)(7). Property owners must pay all outstanding fees in order to appeal, and a successful appeal resolves only future charges; it is not retroactive.  Wilmington assesses interest on unpaid charges.  *Id.* § 45-176.

### III

The USACE owns five properties in Wilmington (the "Properties") spanning 270 acres and nearly 11,888,000

square feet. The Properties serve as a dredge material disposal site in support of the USACE's work dredging waterways near Wilmington. While stormwater runs off the Properties into the nearby river, none of the Properties discharges water directly into the city's stormwater system. *Decision*, 157 Fed. Cl. at 714; J.A. 163 at 247:3–8. Only one parcel contains paved surface area. *See* J.A. 2029–30.

The city assigned the Properties to the "Vacant" stormwater class. J.A. 2048 ¶ 123. The Vacant class has an assigned runoff coefficient of 0.30, meaning that approximately 30 percent of all stormwater will run off a given parcel. J.A. 133 at 126:15–127:8. Based on the 0.30 runoff coefficient and Wilmington's methodology for calculating fees, the city assessed the USACE $2,577,686.82 in fees for the Properties between January 4, 2011, and April 16, 2021. The USACE has never paid Wilmington the assessed service charges, nor has the USACE pursued the city's appeal process.

In December 2016, Wilmington sued the United States in the Court of Federal Claims under the CWA, 33 U.S.C. § 1323, seeking to recover the unpaid stormwater management fees. Wilmington seeks $2,577,686.82 in fees and $3,360,441.32 in accrued interest. The parties cross-moved for partial judgment on the pleadings under Rule 12(c) of the Rules of the Court of Federal Claims ("RCFC"); the court denied both motions in 2018. *City of Wilmington v. United States*, 136 Fed. Cl. 628 (2018) ("*Wilmington I*"). The case proceeded to trial in April 2021. Wilmington presented evidence from two witnesses: the city's Commissioner of Public Works and an expert witness. Following the close of Wilmington's case-in-chief, the court suspended trial, and the government moved for judgment on partial findings under RCFC 52(c).

The trial court granted the government's motion, holding that the Federal Facilities Section waives the United States' sovereign immunity only for "reasonable service

charges" and that Wilmington failed to meet that standard by failing to prove its charges are a fair approximation of the Properties' proportionate contribution to stormwater pollution. *Decision*, 157 Fed. Cl. at 720.

Wilmington appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(3).[4]

## DISCUSSION

We review the legal conclusions of the Court of Federal Claims de novo and its factual findings for clear error. *Martin v. United States*, 54 F.4th 1325, 1327 (Fed. Cir. 2022). To disturb the trial court's factfindings, we must be "left with the definite and firm conviction that a mistake has been committed." *Gadsden Indus. Park, LLC v. United States*, 956 F.3d 1362, 1368 (Fed. Cir. 2020).

Wilmington challenges the trial court's determination that Congress did not waive the United States' sovereign immunity with respect to the stormwater fees Wilmington assessed against the Properties because those fees did not satisfy the definition of "reasonable service charges" under the Federal Facilities Section. We interpret the Federal Facilities Section before turning to Wilmington's arguments.

## I

The Federal Facilities Section requires federal entities such as the USACE to comply with local water pollution requirements, including payment of "reasonable service charges," and waives the United States' sovereign immunity with respect to those requirements. 33 U.S.C. § 1323. The text of the section is broad, subjecting agencies to "all"

---

[4]     The Court of Federal Claims had jurisdiction under 28 U.S.C. § 1491(a)(1) and 33 U.S.C. § 1323. There is no dispute that § 1323 is a money-mandating statute.

requirements "notwithstanding any immunity . . . under any law or rule of law." *Id.* § 1323(a).

Congress emphasized its intent for federal entities to contribute their proportionate share of costs by providing an equally broad definition of "reasonable service charges" in the 2011 amendments. A charge is a "reasonable service charge" when it is "based on *some fair approximation* of the proportionate contribution of the property or facility to stormwater pollution (in terms of quantities of pollutants, or volume or rate of stormwater discharge or runoff from the property or facility)." *Id.* § 1323(c) (emphasis added). The 2011 definition thus establishes a low standard: for a service charge to be "reasonable," it need only represent "some fair approximation" of a property's proportionate contribution to stormwater pollution.

Where possible, we interpret statutes to give meaning to every word in a provision. *Doyon v. United States*, 58 F.4th 1235, 1247 (Fed. Cir. 2023) ("[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (citation and internal quotation marks omitted)). Here, the word "some" does meaningful work. The Merriam-Webster Dictionary defines "some" as "being of an unspecified amount or number." *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/some (last visited April 25, 2023). Accordingly, as used in the Federal Facilities Section, "some fair approximation" refers to any one of an unspecified number of possible fair approximations, and the approximation used by a state or local entity need not be the most accurate[5] or most fair

5   We note that the trial court expressed concern in several instances that Wilmington's chosen coefficient might not be "accurate" as to the amount of stormwater pollution attributable to the Properties. The text of § 1323 makes no mention of the accuracy of a local jurisdiction's

approximation. The standard is thus an objective standard based on what a reasonable person would consider a fair approximation.

In light of the leniency of this standard, we agree with the trial court's observation in this case that there is nothing inherently wrong with Wilmington's *general* methodology for determining a property owner's stormwater management fee. *See Decision*, 157 Fed. Cl. at 720 ("[T]he [c]ourt takes no issue with Wilmington's general approach—*i.e.*, the use of property categories and runoff coefficients."). Indeed, trial testimony demonstrates that Wilmington, through its consultant Black & Veatch, took some care in designing its system. Wilmington's expert testified that at least three-quarters of municipalities base their stormwater utility rate methodologies on impervious area. J.A. 177 at 303:10–16. The city's expert further testified that Wilmington's "process is solid," reflecting quality work from Black & Veatch. J.A. 179 at 312:18–22. The expert averred that county land use records are generally "good sources" for determining property characteristics. J.A. 180 at 314:1–2.

Despite the general reasonableness of Wilmington's approach, however, trial testimony supports the court's finding here that Wilmington's approach, as applied to the Properties, does not meet the statutory definition of

---

fee structure and requires only a "fair approximation." While the degree of accuracy might be a factor in determining the fairness of an approximation, it is not the only factor to be considered. We therefore disagree with the trial court's references to accuracy. Nevertheless, we do not find, as Wilmington suggests, that the trial court improperly imposed a standard of accuracy on Wilmington's data beyond what § 1323 requires. The trial court's comments amount to dicta, and the court ultimately reached the correct conclusion. *Decision*, 157 Fed. Cl. at 723–24.

"reasonable service charges." We find no clear error in the court's factfindings.

First, the city failed to show that the County tax assessment records "properly categorize the Properties for stormwater purposes." *Decision*, 157 Fed. Cl. at 720. On appeal, Wilmington argues that "[n]o trial evidence demonstrated the County's property records' 'vacant' classification of the Properties misrepresented their actual conditions." Appellant's Br. 37. That may be the case. Nevertheless, while the Vacant classification may accurately describe the Properties in a general sense and specifically for the purpose of the County's tax assessments, it is not a label designed to classify the Properties for the purpose of stormwater management. As the trial court found, "Wilmington's system merely assumes that the County's tax records reflect land categories whose definitions mirror those described in Dr. Chow's 1962 Study," and Wilmington's expert "made no independent attempt to substantiate" that assumption or to "provide[] evidence to fill that gap in the record." *Decision*, 157 Fed. Cl. at 720–21.

The city's expert explained that Black & Veatch "looked at those land use records in the County records and made an engineering judgment" to match those records to the ranges Dr. Chow identifies. J.A. 182–83 at 324:22–325:3. What's missing from the record is *how*. The lack of explanation is troublesome given that the County uses 220 different land use codes, and the record does not meaningfully describe how those codes are divided into 11 non-residential stormwater classes. J.A. 175 at 296:10–12. While the County records *could* be a fair and representative data source for classification of the Properties, Wilmington does not explain here how those records correlate to Dr. Chow's 1962 Study. As trial testimony reflects, when asked how Wilmington knows that when the 1962 Study "uses the range of .10 to .30, that that's what the tax records are talking about in terms of the character of the land," Wilmington's expert testified: "I don't know that. . . . I would

assume that Black & Veatch, in allocating those classes – land classes, those occupancy codes, had some basis for doing so. But I don't personally know that." J.A. 194 at 373:13–22.

In light of the evidence before it, the trial court reasonably found that Wilmington has not met its burden to show by a preponderance of the evidence that the County records' description of the properties, which is crucial to the assignment of a stormwater class and runoff coefficient, fairly classifies the Properties for stormwater purposes.

Second, the trial court did not clearly err in finding that the city failed to show the runoff coefficient of 0.30 (i.e., 30% impervious) applicable to the Vacant stormwater class provides a fair approximation of the Properties' rate of runoff. *See* J.A. 227. A runoff coefficient may, in general terms, fairly describe the runoff conditions of most properties in a particular stormwater class. Indeed, the Wilmington Code intends for properties grouped in the same stormwater class to have similar characteristics. *See* Wilmington Code § 45-53(a) ("Storm water class means classes of uses defined such that customers within a class have *similar land use characteristics*." (emphasis added)). But in this case, the trial court correctly recognized the potential risk of unfair charges to the federal government because "if there is wide variation in the actual characteristics of properties within a particular occupancy code, that could well mean the government is being overcharged vis-à-vis other properties assigned the same code." *Decision*, 157 Fed. Cl. at 721.

As the USACE argues, "Wilmington is assuming that the Properties contribute volumes of runoff similar to all other properties within [the Vacant] class and that 30 percent of all stormwater runs off the Properties," without proving "that the [variation of the] actual characteristics of properties within a particular tax-record category is relatively small." Appellee's Br. 23 (citing *Decision*, 157 Fed.

Cl. at 721). We agree. Wilmington has not shown "the degree of similarity within an occupancy code" or shown that the code matches the reality of the Properties' physical characteristics. *Id.* at 24. Further, Wilmington admits that it established its appeals process specifically to address instances in which its stormwater fee methodology subjects property owners to unfair fees, where due to "site specific variances," "in some situations, the resulting measure of imperviousness may differ from the actual imperviousness that exists in a specific property." J.A. 229.

The witness testimony is particularly damaging in this respect. There are 1,724 parcels in the Vacant stormwater class, all of which Wilmington assigned the same runoff coefficient. J.A. 135 at 135:9–12. The Commissioner agreed in her testimony that "the volume of runoff from a property is impacted by various property characteristics," like "their level of imperviousness, the soil, [and] the land covers," and that "a property should be put into a class with other properties that are similar to it, in terms of the characteristics." J.A. 133 at 127:13–17; J.A. 142 at 161:18–21. Yet, when asked whether Wilmington knows "if the dredge disposal sites have similar characteristics to other properties in the vacant stormwater class," the Commissioner testified only that "it's vacant. . . . it's similar in that there's no structure on it." J.A. 142 at 162:14–19. The mere fact of vacancy says nothing about the other physical characteristics of the land that would impact stormwater runoff. In fact, the Commissioner testified that properties with land covers "like marshes or wetlands" could be included in the vacant stormwater class to the same extent as properties with "wooded areas," "regular grass," "loose gravel," "concrete and asphalt," or "different kinds of soils." J.A. 142–43 at 164:16–165:22. In short, the Commissioner agreed that "properties with completely different land covers could be included in the vacant stormwater class." J.A. 143 at 165:16–19.

Wilmington argues that the court "neglected to consider how size differences allow charges on a class containing 'totally different properties' to remain proportional to runoff while retaining 'similar land use characteristics.'" Appellant's Br. 20. Wilmington also contends that because it "normalizes each Property's estimated impervious area by converting to Runoff Units and assessing charges per Runoff Unit, the stormwater charge assessed on a Property is proportionate to that Property's runoff." *Id.* at 38.

We are not convinced. Even if Wilmington were correct on both points, the trial testimony reflects both the importance of impervious area to Wilmington's methodology for non-residential properties and the fact that the Vacant stormwater class contains properties with wide disparities in imperviousness. *See Decision*, 157 Fed. Cl. at 724. Neither the trial testimony nor Wilmington's briefing makes clear how parcel size or ESU alone can negate the impact of the city's flawed assignment of runoff coefficients. We see no clear error in the trial court's factfinding on this issue.

The runoff coefficient is an independent variable in Wilmington's formula that is mathematically essential to that formula in order to calculate stormwater fees for the Properties. It is also the main representation within the formula for the actual stormwater characteristics of the Properties. Without *any* substantiation that the runoff coefficient corresponds, even in a loosely approximate way, to the actual stormwater characteristics of the Properties, Wilmington has not proven the chosen runoff coefficient as applied to the Properties is a "fair approximation." As a result, the trial court did not err in concluding the fees at issue were not reasonable service charges under § 1323(a).

In determining that Wilmington's fees are not reasonable service charges under 33 U.S.C. § 1323, we emphasize that our holding is limited to the facts and circumstances in this case. There is nothing necessarily problematic

about a stormwater fee methodology that uses a multifactor formula, or a formula that includes impervious area or runoff coefficients as variables. We do not seek to disturb other municipalities' systems that meet the statutory definition of "reasonable service charges." *See* Nat'l Ass'n of Clean Water Agencies' Amicus Br. 8–10. A city need not visit properties in its jurisdiction nor perform a "tape measure" analysis to satisfy the "some fair approximation" standard in estimating the amount of stormwater runoff emitted by a specific federal property.

Here, however, Wilmington did not explain how the Vacant land use code corresponded to the runoff coefficients in the 1962 Study nor whether its stormwater class fairly captured variability in Vacant parcels, where in this instance the Properties are used as dredge material disposal sites and only one parcel contains any paved surface. For these reasons, Wilmington's methodology, as applied, led to charges that are not a fair approximation of the Properties' proportionate contribution to stormwater pollution. As a result, the fees Wilmington charged the USACE are not "reasonable service charges" as defined by 33 U.S.C. § 1323(c), and the CWA does not waive the USACE's sovereign immunity with respect to those charges.

## II

Wilmington argues that the United States was required to exhaust the city's appeal process. Appellant's Br. 62; Wilmington Code § 45-53(d)(7). Specifically, the city contends that while the United States "could challenge Wilmington's 'general methodology' without appealing," it "could not rely on the Properties' 'site-specific' characteristics that could have been raised in an appeal." Appellant's Br. 62.

The trial court held that the USACE was not required to exhaust the city's appeal process. In denying the parties' RCFC 12(c) motions, the court found that the "appeal right is permissive," not mandatory, and declined to "apply the

exhaustion doctrine." *Wilmington I,* 136 Fed. Cl. at 632. In ruling on partial findings, the court further noted that (a) appealing a charge is not a process "respecting the control or abatement of water pollution" under § 1323, (b) Wilmington's appeal process is not a "local requirement," and (c) legislative history also supports rejecting exhaustion. *Decision*, 157 Fed. Cl. at 735.  The court rejected Wilmington's argument that Delaware state law requires exhaustion and concluded that Wilmington's forward-looking process cannot provide the USACE's requested relief.  *Id.* at 736.

We agree, principally because Wilmington's appeal process is permissive rather than mandatory and solely forward looking.[6]  Wilmington does not require that property owners pursue its appeal process, and an appeal accordingly cannot be a local "requirement." *Wilmington I*, 136 Fed. Cl. at 632.  Further, because the appeal does not allow for the adjustment of fees Wilmington has assessed to date apart from the correction of clerical errors, it cannot provide the relief the USACE seeks.  J.A. 160 at 233:10–12.  The USACE was not required to exhaust the appeal process.  As a result, the trial court did not abuse its discretion by refusing to mandate exhaustion.

### III

We find the remainder of Wilmington's arguments unavailing.

---

[6]   Notably, Wilmington does not even permit property owners to appeal their stormwater fees unless they have paid *all* outstanding fees, including those not related to stormwater management.  J.A. 127 at 103:9–15 (explaining that if a property owner has "anything outstanding," such as "taxes, water fees, sewer fees, [or] parking tickets," the city "won't consider an application").

First, we reject the city's argument that the trial court erroneously "assessed issues under the *de novo* standard of review." Appellant's Br. 43. The court appropriately conducted a trial and made factual findings on a clean slate. *See* RCFC 52(a) ("In an action tried on the facts, the court must find the facts specially and state its conclusions of law separately."); *cf. Int'l Paper Co. v. United States*, 36 Fed. Cl. 313, 322 (1996) (explaining in tax refund context that suit requires "a trial *de novo*"). In doing so, the court did not fail to consider Wilmington's evidence. Further, the court held the city to the correct standard of proof—preponderance of the evidence—in determining whether the city's charges satisfied 33 U.S.C. § 1323.

Second, the trial court duly considered Wilmington's evidence. The city argues that the trial court was required to consider a 2008 EPA publication that described approvingly Wilmington's stormwater management system as "fair and equitable" as a "binding factual admission." Appellant's Br. 46; *see* J.A 1078. The trial court correctly found that the 2008 publication predates the 2011 amendments' definition of "reasonable service charges" and, in any event, does not satisfy the city's burden.

Third, we do not reach Wilmington's argument that the United States is required to pay interest on its unpaid stormwater management fees. Although the trial court determined that Wilmington's assessed fees are not "reasonable service charges," it proceeded to conclude that the CWA does not waive the USACE's sovereign immunity with respect to interest because the Federal Facilities Section does not provide an express waiver of sovereign immunity. *Decision*, 157 Fed. Cl. at 738. Because Wilmington's fees are not reasonable service charges, however, any discussion of interest for fees that are not owed is advisory. We decline to reach this issue.

CONCLUSION

Because Wilmington's stormwater management fees are not "reasonable service charges" under 33 U.S.C. § 1323, the CWA does not waive the USACE's sovereign immunity. Accordingly, we affirm the decision of the Court of Federal Claims.

**AFFIRMED**